```
               UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
                    TERRE HAUTE DIVISION



JOSHUA B. CRISSEN,          )
                            )
          Plaintiff,        )
                            )
                            )   2:12-cv-00355-JMS-WGH
          vs.               )   Terre Haute, Indiana
                            )   November 8, 2013
VINOD C. GUPTA, SATYABALA   )
V. GUPTA, WIPER             )
CORPORATION, VIVEK V.       )
GUPTA AND BANCO POPULAR     )
NORTH AMERICA,              )
                            )
          Defendants.       )


          TRANSCRIPT OF HEARING ON DISCOVERY MOTIONS



     BEFORE THE HONORABLE WILLIAM G. HUSSMANN, JR.

      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
```

Transcribed by:        Judy Farris Mason, CSR
                       Official Court Reporter
                       United States District Court
                       318 Federal Building
                       Evansville, Indiana  47708
                       Tel.  (812)459-9805
                       Email: Judy_Mason@insd.uscourts.gov



               Proceedings recorded digitally.

A P P E A R A N C E S:

FOR THE PLAINTIFF:

                    John S. Sandberg, Esquire
                    Jesse B. Rochman, Esquire
                    Sandberg Phoenix & Von Gontard PC
                    600 Washington Avenue
                    15th Floor
                    St. Louis, Missouri  63101
                    Telephone:  (314)231-3332

FOR GUPTA DEFENDANTS AND WIPER CORPORATION:

                    David J. Theising, Esquire
                    Stephen E. Arthur, Esquire
                    Harrison & Moberly
                    10 West Market Street
                    Suite 700
                    Indianapolis, Indiana  46204
                    Telephone:  (317)639-4511

FOR BANCO POPULAR NORTH AMERICA:

                    Gregory A. Blue, Esquire
                    Dilworth Paxson LLP
                    99 Park Avenue
                    Suite 320
                    New York, New York 10016
                    Telephone:  (917)675-4250

                    Joshua D. Wolson, Esquire
                    Dilworth Paxson, LLP
                    1500 Market Street
                    Suite 3500(E)
                    Philadelphia, Pennsylvania 19102
                    Telephone:  (215)575-7295

```
 1                     (Audio begins at 3:45 p.m.)

 2              THE COURT:  -- is here, Mr. Wolson, Mr. Blue, are

 3    you all able to hear me okay on the telephone?

 4              ALL COUNSEL:  Yes, Judge.

 5              THE COURT:  Everybody is good?  Okay.

 6              I've got Mr. Theising and Mr. Arthur here in the

 7    courtroom, and I appreciate your patience on this one.

 8              I guess the record should reflect that we're in Cause

 9    2:12-CV-355, Crissen v. Gupta.

10              Show the matter is before me today on the 8th of

11    November.  I had set a hearing with respect to any remaining

12    problems with a motion to compel.  The entry went out

13    yesterday, and I apologize for taking as long getting it out as

14    it could, but we had a few more things to slog through there.

15              So I guess, Mr. Sandberg, my thoughts in this case is

16    the order allows you to give me any reasons why I should

17    reconsider that order, particularly with respect to the issue

18    of whether excluding Jesse Rochman from some of the information

19    in discovery is appropriate or not.  I don't know if there are

20    other issues before the parties that they want me to take up or

21    not.

22              But I guess, John, I would let you start the ball

23    rolling with telling me what you think we need to address or if

24    we need to address something today and how we approach it from

25    your perspective.
```

```
1              MR. SANDBERG:  Yes, Judge, that is what I requested

2   earlier and what you granted, which is I wanted to make a

3   record as to the portions of your order of yesterday that

4   pertain to Jesse Rochman, and that is what my comments will be

5   directed to.

6              THE COURT:  Okay.  Go ahead.

7              MR. SANDBERG:  Okay.  Well, and again I'll try and

8   make it as short and direct as possible, Judge.

9              Essentially in two principal respects I think that

10  there isn't the evidence before the Court to lay a proper

11  foundation for the relief that has been given to prohibit Jesse

12  Rochman, and the two respects are that I don't think the threat

13  that we're talking about gives a foundation, nor do I think

14  there's been any showing that there is any proprietary/trade

15  secrets that would be disclosed.  The third and final area,

16  I'll direct a few remarks to your amendment to the protective

17  order as it pertains to the five categories of documents just

18  as to issues that are raised by that order, and again I'll try

19  and make my remarks very focused.

20             First of all as to the threat that is the foundation

21  of this whole issue, is that supposedly Barrett Rochman -- and

22  we'll take it as an assumed fact -- made a threat that he'd do

23  what he could to drive Vinod Gupta out of business.  Well, I'll

24  point out that that's not illegal; it's not immoral; it's not

25  actionable.
```

1           And, you know, in the United States that's called

2    competition; you can do whatever you want to drive out a

3    competitor out of business.  If it's not illegal, you're

4    entitled to do it.

5           And the fact that he made a threat to drive him out

6    of business does not imply and it's not proper to infer that he

7    would do illegal acts to drive him out of business.  The mere

8    threat that "I'm going to do what I can to drive you out of

9    business" does not -- is not appropriate to infer that they'll

10   take illegal actions, which is nevertheless the foundation

11   here.

12          To take action to restrict access of a lawyer or any

13   individual is usually only imposed for trade secrets.  Now, I

14   think "proprietary" means the same thing so I'll switch back

15   and forth.  I don't take them to mean different things; it is

16   information that will cause damage if disclosed.  And the

17   Courts have said that the damage has to be clearly defined, and

18   it has to be a serious injury.

19          So let's talk about it.  Let's talk about it because,

20   you know, in large part I'll refer to the financial statements.

21   There's been talk about tax returns, but tax returns are just a

22   variation on financial statements, so by talking about

23   financial statements, we're talking about records that show the

24   performance of a business.

25          Do I agree that such records here are confidential?

1    Yes, I do; I do agree that they are confidential.  You know,

2    I'm sure Mr. Gupta has taken necessary steps to make sure

3    they're not inappropriately disclosed to others, and that makes

4    them confidential.  My salary is also confidential, meaning,

5    you know, it is private to me.  But the fact that something is

6    confidential does not lead to even, again, an inference that it

7    is proprietary and that its disclosure will cause some clearly

8    defined and serious injury.

9           And here there has been no such damage that has been

10   clearly defined or any serious injury outlined other than a

11   broad, open claim that this would cause injury, which is what

12   Mr. Gupta has claimed.  But we haven't asked for any

13   information, you know, in what's before the Court today, such

14   as asking for how he manages to decide which properties to bid

15   on, which could be a trade secret proprietary to him.  We've

16   not asked anything of the sort.  We've asked for his financial

17   statements.

18          And what about the financial statement is

19   proprietary, meaning that its disclosure will give someone else

20   a competitive advantage?  Well, here we're talking about the

21   Indiana tax certificate business, and, you know, Mr. Gupta is

22   in that business; Mr. Rochman is in -- Barrett Rochman is in

23   that business.  We know just from, you know, public record

24   there's several dozen other companies in that particular

25   business of bidding on properties and buying tax certificates.

1          So how do you make money in that business?  Well,

2     Indiana has defined how someone operating in that business

3     makes money, and it's by interest and interest only.  You get

4     10-percent interest for the first six months, 15-percent

5     interest thereafter.  You can take publicly available data from

6     SRI -- you might recall, Judge, we've mentioned this company to

7     you before that works for all these Indiana counties.  And SRI

8     therefore collects all this information, which is public

9     information they're collecting, and you can access it through

10    SRI.

11         And you could come up with, for example, if you

12    wanted to know the average number of days before a property

13    owner in Indiana redeems their property, you could very quickly

14    run a calculation and know exactly that it's 89 days.  I'm just

15    picking a number out of the air.  But you can know what that

16    number is.

17         You could break it down by county and know for each

18    county what is the average days before redemption.  You can

19    figure out what the average price for each property is in that

20    county or in the state.

21         And since the interest rate is set by statute, you

22    could hypothecate if I buy ten properties in Adams County where

23    the average, you know, property price is 4,500 and they in that

24    county redeem on average in 110 days and calculate exactly what

25    your revenue is.  And then, of course, you know, your expenses,

1  whatever it is to comply with the statute would be your

2  deduction, and then you end with a profit.

3          There is nothing proprietary about how you make money

4  in the Indiana tax certificate business.  Anyone can figure out

5  how you make money.

6          Now, how you can make, you know, even more money by

7  having the right strategy of buying property, we're not

8  interested in that information and haven't asked for that

9  information.  We've only asked for the information as to the

10 financial statements to show whether -- and one item and one

11 item only is reflected on there, which is payment for title and

12 notify costs.

13         So, you know, we think the threat is not something

14 that's actionable, but the Court by its order has in essence

15 said, well, there is some action you can take when someone

16 makes a threat; you can try and interfere in the lawsuit that

17 only happens to involve his son as an attorney.  And then there

18 is no real evidence that anything here is proprietary.  And I

19 have looked; I have not found cases that restrict a person,

20 including a lawyer, from access to data when it's not a trade

21 secret.

22         Then finally I said -- so that's, in summary, my

23 views, is that we really don't have the foundation to provide

24 the support for the relief you've given here.

25         Returning to your amended protective order, a few

1   comments about it because I think there's some problems in how

2   we make this workable if the limitation stands.  Well, first

3   issue is you've said you're going to amend paragraph 8B, but,

4   Judge, we're in the middle of discovery.  Thousands, tens of

5   thousands of pages of documents have been produced already.  So

6   when we talk about, for example, the 137Bs, which in, you know,

7   paragraph -- I mean requests 13 and 14 -- and you ruled on

8   this -- the issue is about producing original documents so we

9   can look at the metadata, and we already have all those 137Bs.

10          And so now your order in essence says that

11   Mr. Rochman can look at the 137Bs, but he can't look at the

12   metadata connected with the 137Bs because somehow the metadata

13   is proprietary or would cause some competitive harm if the

14   metadata from the 137B was disclosed.  I'm not sure that makes

15   a lot of sense.

16          We asked about communications with Vivek about

17   services and payments.  Of course, this was covered in our

18   first request.  That's paragraphs 15 to 20.  Again, what is

19   proprietary when we ask for -- we want documents about --

20   asking Vivek to do title and notify services and asking for

21   documents that show payment for those title and notify

22   services?

23          That's the heart of this case, Judge, so why should

24   Mr. Rochman be limited from looking at documents that go to the

25   very heart of the case, and what competitive disadvantage is

1    conceivable from looking at these documents about title and

2    notify expenses?

3            And then, finally, you talk about, you know, in the

4    last part, 27 to 29 of our request, about the bank records to

5    the extent they haven't been produced.  Thousands of pages of

6    bank records have been produced.  We subpoenaed both Banco

7    Popular, and we subpoenaed Wells Fargo.  They're not part of

8    the case, but there is another bank account that has been used

9    in the tax certificate business that involves Wells Fargo,

10   Judge.

11           We have gotten thousands of checks from those two

12   banks.  And, again, maybe there are some that now we'll get in

13   addition to those thousands that we already have, but it's hard

14   to understand that it makes a lot of sense that he can look at

15   the thousands that have already been produced but not the extra

16   ones that end up being produced.  And what, you know, again

17   proprietary, potentially damaging information is in those

18   checks?  And I'm at a loss.

19           That does circle back to paragraph 3 to 7 and 9 to

20   12, which deal with the tax forms and deal with financial

21   statements, and, of course, that goes to my comments earlier

22   where I don't think the foundation has been laid to show that

23   there is information there, if disclosed, that would cause, you

24   know, again, clearly defined and serious injury to Mr. Gupta.

25           Thank you, Judge.

```
 1            THE COURT:  Okay.  Mr. Arthur, Mr. Theising, do you
 2   want to respond in some regard?
 3            MR. ARTHUR:  I'd like to respond to part of it, and,
 4   if it's okay with the Court, Mr. Theising will address a
 5   couple of the other issues.
 6            If I could approach the Court, I've got three
 7   exhibits that I'd like to give to the Court, and I'll have Marc
 8   Stearns from my office send those over to Mr. Sandberg and
 9   Mr. Blue.
10            THE COURT:  Okay.  Have they seen them before now?
11            MR. ARTHUR:  No, no.
12            THE COURT:  Okay.  What's the nature of the
13   documents, and why would I need to see them?
14            MR. ARTHUR:  These are -- these are pleadings that
15   we got off of the Internet in the *Phoenix Bond versus Barrett
16   Rochman and Jesse Rochman* and others lawsuit.  As I understand
17   it, it's a class action lawsuit that was filed by Phoenix
18   Bond, an indemnity company, and VCS Services Company against
19   these guys for RICO violations, fraud, basically bid rigging
20   in Illinois.
21            And the allegations that are in the complaint and
22   Jesse Rochman's answer as a defendant establish that he is not
23   just Barrett Rochman's son; there's not just a familial
24   relationship, which caused us concern; he's not just an
25   attorney of record in this case who's related to Barrett
```

1    Rochman, which is a cause of concern to us in this case; but it

2    turns out that Jesse Rochman during some of the relevant period

3    of time that they've tried to sue our client was an actual

4    competitor of Vinnie Gupta.

5            He was a principal in two businesses that had a

6    relationship with Barrett Rochman's companies.  They went to

7    tax auctions in Illinois, and they bid on properties, and they

8    were alleged to have engaged in certain activities that

9    violated federal law.

10           And so I wanted the Court to have this information.

11   When Mr. Sandberg just makes the conclusory statement that

12   there's no threat, the fact is Barrett Rochman did threaten my

13   client, just like he threatened Mr. Groom over in Illinois; he

14   threatened to run these people out of business because they

15   wouldn't engage in the bid rigging that the man just pled

16   guilty to in Federal Court.  Barrett Rochman is a criminal.

17   He's confessed and pled guilty to federal bid-rigging charges.

18           And now we find through this *Phoenix* case that his

19   son was in the business with him at the time.  So now not only

20   do we have in play the issue that Barrett Rochman has, we

21   believe, using Jesse Rochman, the John Sandberg law firm to

22   file these lawsuits to put competitors out of business, but we

23   now know that Jesse Rochman, who's counsel of record, is a

24   competitor and has been a competitor.

25           And so I thought that these documents -- they're

1   public record, but I thought that it would be helpful if the

2   Court would see these, these admissions by Jesse Rochman and

3   these allegations.

4           Now, the -- John says that, okay, not a lot of

5   threat, not a lot of confidentiality here.  And the approach

6   that the plaintiffs have taken in discovery -- and I think the

7   Court's order reflects an understanding of this -- is that

8   they -- and the third request for production is a masterful

9   example of it.  They have these broad requests that ask for

10  everything.  There's not even an attempt to limit the things

11  that they request to title search and notification costs, which

12  is the issue in the case, as the Court has said many times.

13          So then we have to go through the informal process of

14  working with John Sandberg to try to limit it.  And as the

15  Court noted in your order, in some cases we were able to work

16  out an agreement that he would limit his request to documents

17  that had information about notification and title costs.  And

18  we said, "Okay, if you're willing to limit your requests to the

19  issue in the case and not ask for all this other stuff about

20  Mr. Gupta's business, then we can do that," and we worked out a

21  number of those third requests with that type of an approach.

22          But when it came to the tax returns and when it came

23  to the type of information that gives a competitor, whether

24  it's Jesse Rochman or Barrett Rochman, the essential

25  information about -- the financial information about Vinnie

1  Gupta's business, we couldn't have that kind of an

2  understanding.  They want all of that, and yet he comes to

3  court today and he says, "All we ever want and all we ever ask

4  for, Judge, is just the information about title costs and

5  notification costs; that's the issue in the case," and we agree

6  with him on that.

7           And our problem with the Court's order, respectfully,

8  is that while we appreciate and think that you're correct to

9  limit Jesse Rochman's access to these documents, we also

10 believe that there is another way to get the information to the

11 plaintiffs that they need to prove their case and conduct

12 legitimate discovery without giving them this access to our

13 financial information which is proprietary to our business,

14 which is our business and not a competitor's business; it's not

15 the business of this Court; it's not the business of the public

16 unless it's an issue in this case, and so much of that

17 information is not an issue in the case.

18          So what we -- what we would propose is that, one, the

19 Court affirm its order as to Jesse Rochman.  Jesse Rochman --

20 and I'm not going to use the Court's time this afternoon to

21 bash on that young man, but he has -- we have documented in our

22 papers with the Court a number of things that I think raise a

23 real question about his ethics and about his ability to be in

24 this case.

25          He has -- in the *Groom* case, for example, just one

1    example, in the *Groom* case we showed you that there was a

2    question about who solicited the plaintiff in that case.  The

3    plaintiff in that case said it was Jesse Rochman.  They take

4    the deposition of Barrett Rochman; he says he didn't do it.

5    Then the defendant in that case says, "Well, you can't do that.

6    That violates the Illinois ethics rules of solicitating

7    clients."

8            So they start to gear up on that issue, and then all

9    of a sudden here comes an affidavit from Barrett Rochman

10   saying, "Oh, I guess I made a mistake at my deposition.  I was

11   the one that did the solicitation."  Okay.  That shows that

12   Barrett Rochman is not -- does not have veracity.  He either

13   lied in his affidavit or he lied in his deposition.

14           But what's important for Jesse Rochman's part of the

15   case is he was attorney of record.  He had to know that his dad

16   was either lying at the deposition or he was lying with the

17   affidavit.  If he was sitting there at the deposition when his

18   dad was lying, he should have corrected the record, and he

19   should not have let that become record of the case.  If --

20   later if he believed that the deposition was true and later he

21   gets an affidavit from his dad that goes the other direction

22   and that's a lie, he had a duty not to file it.

23           And so that's just one example of why we believe that

24   the Court is appropriate to limit Jesse Rochman's access to not

25   just -- we don't care that Jesse Rochman sees the papers that

1   are necessary for Mr. Crissen to pursue his case that relate to

2   title costs and notification costs, but we sure do have a

3   problem with Jesse Rochman having access to our tax returns,

4   financial documents, any of those things that contain the

5   information that goes beyond that.

6          And there is another way, we submit to the Court,

7   that we could do this.  John Sandberg is a good lawyer; he's a

8   tough lawyer.  He doesn't give (inaudible) on anything, but

9   I've not had any dealings with him right now where I've found

10  him to be dishonest in the way he's approached us in this

11  lawsuit.  And he seems to be the lead counsel as far as

12  Mr. Crissen's case goes.

13         What we did with -- the way we were able to work out

14  some of those other requests, like the Google emails, for

15  example, those were -- those were a broad request, like "all

16  the emails that you have."

17         Judge, do you want me to stand up?

18         THE COURT:  No, you're fine.

19         MR. ARTHUR:  I'm happy to do that.

20         THE COURT:  No.

21         MR. ARTHUR:  They asked for all the emails.  We went

22  back and said, "Look, a lot of these emails have nothing to do

23  with title cost, notification cost," the issues in this

24  lawsuit.  And they rephrased their request to say that they

25  wanted any email communications that related to the issues of

1    the case.  And so then we've been producing those documents

2    with that limitation.  It's not a problem.

3            If -- now let's talk about tax returns.  If what they

4    really want from the tax returns is proof that Vinnie Gupta did

5    not declare title costs or notification costs as a deduction

6    expense, then we could use that same process here.  We could

7    limit the request for the tax returns to that question.

8            John says that he wants that to use it sort of like a

9    request for admission.  If we can't produce the document, then

10   he wants to be able to argue that we should have that in the

11   tax return and that means that those costs weren't incurred.  I

12   think that's his argument.

13           And so if we limit it, which we'd ask the Court to

14   restructure the order this way, to limit those requests for tax

15   returns to the title costs and notification costs, we will

16   answer that request for admission and say whether there are --

17   whether the tax returns has that information or not.

18           If it has that information, we'll produce the

19   document.  If it doesn't have that information, then we will

20   say, "There is no information in the tax return about it."  And

21   then he has what he needs to go argue.  Now, one of the things

22   that Mr. Theising is going to talk to you about is that -- is

23   whether that information shouldn't even be on a tax return, but

24   just conceptually that should solve the problem.

25           You raised a question in your order about

1    verification.  If we say that there's nothing in the tax return

2    about title and notification costs, then there's nothing to

3    verify.  That's what he wants to hear.  If we say that there is

4    something in there, we're going to give him the document so he

5    doesn't need to verify it by seeing the whole tax return.

6           If -- we are trying to work with the plaintiff and

7    we're trying to work with the Court, Judge, but when you look

8    at what we believe we have to lose by having all of our

9    financial information disclosed to a party that has sued us --

10   and John Sandberg has never denied they're trying to run my

11   client out of business.  That's the thing that amazes me about

12   that.  He just says, "So what?  It's legal."

13          But, you know, how many cases have you had in your

14   career where the plaintiff has actually said, "Yeah, we're

15   trying to run them out of business"?  They're choosing

16   litigation to do it.  It's -- we're businessman; it's

17   competitors.

18          I mean, I think that it's appropriate for the Court

19   to give an extra layer of protection here and to make sure that

20   these requests are crafted to carefully address only the

21   information that's necessary for the plaintiff to prove the

22   case.  And in light of those kinds of statements or refusals to

23   disclaim all the other stuff that we're concerned about, I

24   think the Court should err on protecting it from disclosure

25   until the plaintiff can show that they need it.

1        And so that's what we're willing to do as a way of

2   addressing the tax return issue.  My understanding is -- from

3   those tax returns is that they do not show any title or

4   notification costs.  They don't reference title or notification

5   costs.  They don't specify any amount for title or notification

6   costs as to these redeemed properties, which is what's at issue

7   here.

8        And so why not let us amend our answer to the request

9   for production, state that, and then he has what he purportedly

10  wants.  And I promise the Court that if I'm looking through

11  those documents again and I see something, then he's going to

12  know about it.

13       THE COURT:  Okay.  Let me go back one step because

14  the beginning of this started out about whether I should look

15  at three documents that you have there that have not been

16  marked today and have not been seen by the opposing party

17  prior to today.

18       Mr. Sandberg, do you have any objection to those?

19  They purport to be -- and I haven't seen them yet -- documents

20  that are taken from public record in another lawsuit.  Any

21  objection to my considering those as a part of the evidence

22  today?

23       MR. SANDBERG:  Yes, Judge, I do, for the reason that

24  we cited this case in legal briefs in this case, so the case,

25  the *Phoenix* case has been cited from early on in the case.

1   It's not a new -- you know, it's not newly discovered by

2   anyone.  This case has been known.  All right?  Went up to

3   U.S. Supreme Court, so it's a well-known case in the RICO

4   field.

5           So it's not like -- and I didn't hear Mr. Arthur

6   claim that this suddenly came to their attention or something.

7   We've cited in the case.  I don't remember whether the judge in

8   her order on any motions has cited it, but, nevertheless, it's

9   a well-known case.

10          But I haven't seen the documents.  If Mr. Arthur

11  wanted to submit the documents to you today, he could have

12  easily emailed them to me before the hearing so I have some

13  opportunity to respond to what's in them.  I'm afraid and the

14  reason why I'm objecting is like in *Groom* where they cite, this

15  is something where there was a hearing before the U.S. District

16  Court judge on this issue of supposed solicitation.  The Court

17  ruled otherwise based on the record in front of him.

18          And that order where he ruled, you know, again, I can

19  get it to you, Judge, or, of course, it is available to the

20  public where he ruled on the issues.  So I don't think it's

21  appropriate to be rearguing issues in a different case where

22  the Court's already ruled on that issue at the time and ruled

23  against the position that Mr. Arthur is proposing to you.

24          So, no, I do object because I'm afraid the same thing

25  will happen here, is that, you know, for example, he's

1   suggested that BRB, that's part of the *Phoenix* case, was a

2   competitor.  They've never done business in Indiana, so maybe

3   they're a competitor of Mr. Gupta in Illinois, but who cares

4   about Illinois and what goes on in Illinois tax certificate

5   business?  That's not what this case is about.  And BRB is not

6   a competitor of Mr. Gupta in the Indiana tax certificate

7   business.

8           So that's what I'm concerned about, is about little

9   pieces of information being taken about other decided cases.

10  If he wants to cite to the opinions, you know, and wants to

11  hand you the opinion in the *Phoenix* case, I've got no objection

12  to that.  That means that it was considered, and the Court

13  ruled on it, looked at all the evidence.  Then, you know,

14  that's appropriate for you to look at.

15          But pulling out a couple of pleadings from -- I

16  believe that *Phoenix* case went on for something like six or

17  seven years and, you know -- and had multiple appeals.  So, you

18  know, pulling out a few documents from a case that big, a

19  reported decision, I don't think is appropriate when I haven't

20  seen them.

21          THE COURT:  All right.  I'm going to deny the

22  request to look at them at this point in time.  I do want to

23  focus counsel's attention on this.  We're here today to

24  determine whether I have made an improper discovery order.

25  Anyone who doesn't like it has the right to appeal that

1  decision to the District Court judge if they think I have been

2  clearly erroneous and contrary to law, as it were.

3          My focus at the hearing today is to give Mr. Sandberg

4  a reason to tell me why I should reconsider the decision and

5  allow Jesse Rochman to see this.  I do perceive some relevance

6  in what Mr. Arthur has suggested in terms of knowing what

7  Mr. Rochman's overall position is with respect to Mr. Gupta,

8  whether it's direct competitor, albeit in some other state, or

9  not, so I will likely consider what he's suggested relevant.

10          On the other hand, I think Mr. Sandberg's correct

11  that a balanced approach requires me to see not just the

12  pleadings that allege he did something like that but the

13  Court's order that finds whether he did or did not do that in

14  terms of that.  So if the parties want to submit those

15  documents from that case, I'll allow them to be submitted in

16  the next seven days.

17          And, Mr. Sandberg, if you want to submit any

18  additional components of that record so that I have the full

19  record before I decide whether to reconsider, I'll be glad to

20  take both sides' proffers with respect to what that evidence

21  is.

22          MR. SANDBERG:  All right.

23          THE COURT:  But I think that I'll look at that.

24  Again, I don't want to create satellite litigation over what

25  is a discovery ruling.  Real frankly, my discovery ruling to

1    keep Jesse Rochman from seeing this is during the course of

2    discovery.  As I think everybody understands in the Seventh

3    Circuit, once parties submit things that they want to be

4    protected to the Court for decision or puts them into evidence

5    in the public forum, they are no longer protected by the

6    protective order.  And that's the drawback to public

7    resolution of your disputes, is that you can keep it private

8    while you're discovering things, but you can't have the judge

9    rule and say, "I'm ruling, but I'm not telling you why."

10           So my sense is this is a temporary order that

11   keeps Jesse Rochman from seeing these things through the

12   discovery-process portion of this.  If there is a reason,

13   Mr. Sandberg -- Mr. Sandberg, you appear to have a very

14   competent firm, multiple lawyers able to address this.  It's

15   not at all unusual for me to have certain Chinese walls in

16   place with respect to occasional lawyers who have conflicts

17   because of prior dealings in other firms.  This does not seem

18   to me to be unusual, given that you have -- it isn't like Jesse

19   Rochman is a sole practitioner, and by virtue of this order I

20   am prohibiting his client from having counsel of his choice.

21           So in sort of 25 words or less, I guess,

22   Mr. Sandberg, any other reason that you think I need to

23   reconsider my order with respect to Jesse Rochman?  Anything

24   else?  I think you have articulated those things with respect

25   to whether the threat is sufficiently articulated, whether this

1    is proprietary or not proprietary in some regard, and that

2    there are some pragmatic problems.

3            Addressing the pragmatic problem with respect to

4    this, my protective order wasn't amended until this point in

5    time.  I can't unring the bell with respect to what Mr. Rochman

6    may or may not have seen in things produced prior to this date.

7    All I can do is say prospectively he may not view the items

8    that are designated in that regard, and that's what I would --

9    that's my intention of that.

10           I realize that's some pragmatic problems out there

11   because, gosh, we've gotten some stuff; maybe we haven't gone

12   all the way through that stuff yet.  It was produced before the

13   protective order.  What do I do about that?  The answer is,

14   starting the day of the protective order, Jesse Rochman cannot

15   view those things that are subject to the production in those

16   categories.

17           And so, I guess, to go back and to try to clarify

18   this before I have to start paying the CSO overtime, as it

19   were, is there anything else, Mr. Sandberg, you think I should

20   know that we haven't discussed today?

21           MR. SANDBERG:  No, Judge.  I think we have discussed

22   the --

23           THE COURT:  All right.  Mr. Theising, there were

24   some things, it was referenced, you need for me to know or

25   understand.  What do you need to tell me at this stage?

1              MR. THEISING:  Thank you, Your Honor.  Is it okay if

2    I sit?

3              THE COURT:  Yes.  Either way.  Whatever you're

4    comfortable.

5              MR. THEISING:  I have -- I, on behalf of Mr. and

6    Mrs. Gupta and Wiper Corporation, have some concerns with the

7    Court's order of yesterday that I wanted to bring to the

8    Court's attention.  I understood that today, based on what the

9    Court's order said and what the Court had previously indicated

10   to the parties, would be an evidentiary hearing to take

11   evidence on those issues, and so I'm prepared to talk about

12   some of those things.

13             But let me begin, Your Honor.  If the Court has a

14   copy of its order --

15             THE COURT:  I do.

16             MR. THEISING:  -- from yesterday --

17             THE COURT:  Uh-huh.

18             MR. THEISING:  -- page 13 --

19             THE COURT:  Okay.

20             MR. THEISING:  -- first full paragraph, and I'm

21   going to cite this, Your Honor, as an example of a problem

22   that you're going to understand here in just a minute.

23             Mr. Sandberg in his requests for production numbered

24   9 through 12 asked four or five or six different ways for

25   copies of checks that had been issued to Vivek Gupta or Lewis

 1    Maudlin for work that was reflected on the 137B forms as title

 2    search and notification costs.  The Court -- the Court notes in

 3    the second -- the first full paragraph in the middle of the

 4    page that "plaintiff states that none of the documents produced

 5    is a financial statement or a check described by requests 9

 6    through 12" and even cites to a place in the docket where

 7    that's true.

 8            We've indicated to the Court, Your Honor, in our

 9    briefing in this case that we have produced those things.  I

10    didn't have time, Your Honor, since receiving the Court's order

11    yesterday afternoon and preparing for today's hearing, to go

12    through and gather all of the checks.  But if I may approach,

13    Your Honor, I gathered some of the checks.

14            THE COURT:  All right.

15            MR. THEISING:  And for John's benefit, these are

16    Documents VG2731 through VG2764.

17            MR. SANDBERG:  I could not hear whatever was said

18    there.

19            THE COURT:  He said the documents that he wants to

20    tender, which reflect checks, are --

21            MR. THEISING:  VG2731 through VG2764, and they are

22    marked as Exhibit 1.

23            THE COURT:  All right.

24            MR. SANDBERG:  I know what those checks are, Judge,

25    and none of those checks are payments for title or notify

 1  costs.  They're all checks for, like, 5,000, 10,000, and

 2  they're all in, like, a -- it's, like, a two-year period,

 3  maybe it's two-and-a-half years.

 4           THE COURT:  Okay.  Well, let Mr. Theising finish up

 5  where he's going just a minute --

 6           MR. SANDBERG:  Sure.

 7           THE COURT:  -- and then I'll ask you to respond.

 8  Okay?

 9           MR. SANDBERG:  Sure.

10           MR. THEISING:  Again, Your Honor, I don't believe

11  it's accurate for the plaintiff to state that we did not

12  produce checks.  These are checks -- we actually produced them

13  twice, Your Honor.  The checks you're looking at are the

14  Bates-stamped ones that were on the CDs that we originally

15  produced with over 48,000 documents and electronic records.

16           But Mr. Sandberg wasn't happy with that.  He insisted

17  upon seeing the original -- original documents because we --

18  remember, we scanned them into PDF, and he wasn't happy with

19  that; he wanted to see the real thing.  So Your Honor ordered

20  the defendants to let him see the real thing, so he drove from

21  St. Louis over to Indianapolis a month ago and looked at the

22  real thing.

23           These are the same things, Your Honor, I'm holding in

24  my hand, but they don't have Bates stamps on them.  So he's

25  looked at them twice and knows full well that the defendants

1  have produced checks with Vivek Gupta's name on them for

2  notification and title costs.  It's just not the case.

3          Now, I understand that the Court's order wants us to

4  go back through the over-50,000 documents and electronic

5  records that we've already produced and pick out each and every

6  check out of all those 50,000 documents and electronic records

7  and list them in response to the request for production that

8  Mr. Sandberg has sent us.  I think that's burdensome, Your

9  Honor, but Your Honor has ruled, but I'm trying to make my

10 point that we've given it to him twice, and he's represented we

11 never gave it to him.

12         This leads to the larger problem, Your Honor, that we

13 have with the Court's order yesterday, with all due respect.

14 Mr. Arthur explained to the Court how we have been able to

15 resolve some of the other discovery disputes in this case.  The

16 Court may recall that Mr. Sandberg sent us a request for

17 production to produce each and every email ever sent or

18 received from anyone to VGupta@gmail.com.  That was a broad

19 request for every single email ever sent or received to that

20 email address.  And, of course, we objected.  The Court saw our

21 objection.  We said that could be anything; that could be

22 emails to Mom.

23         So we worked it out, and the way we worked it out,

24 Your Honor, was that Mr. Sandberg finally agreed to limit that

25 request for production to all emails sent or received from

1   anybody to VGupta@gmail.com that relate to the claims in this

2   case.  And we thought that was a reasonable request.  So he

3   limited the request to the specific issues in this case, and we

4   responded.  And, frankly, Your Honor, that's how we've worked

5   through most of the requests that you noted your order

6   yesterday that we were able to work out.

7            The problem, Your Honor, comes back to the tax

8   returns and the financial information.  Mr. Sandberg has asked

9   this Court to assume -- if you go back and look at the briefs,

10  he argues to this Court -- in fact, the only argument that he's

11  made to this Court to get the tax returns of Mr. Gupta is that

12  he thinks they should show whether Mr. Gupta paid money to

13  somebody or some entity to do this title search work and

14  noticing work and should also reflect the income that he

15  received from the counties when Mr. Gupta was reimbursed for

16  those expenses.  And he's asked this Court to assume that that

17  information is or ought to be on a tax return.

18           Your Honor, if I may approach the bench, I have an

19  affidavit from Robert E. Peck, CPA.

20           Can we have Marc send this stuff to John so he can

21  look at it?

22           UNIDENTIFIED SPEAKER:  Sure.

23           THE COURT:  Okay.  That's going to be Exhibit 2, is

24  the affidavit of Peck?

25           MR. THEISING:  Yes, sir.

1          THE COURT:  Okay.

2          MR. THEISING:  John, for the record -- John, for the

3    record, you're being emailed a copy of this affidavit

4    simultaneously with the time that I am handing it to the

5    Court --

6          MR. SANDBERG:  Well, Judge, I --

7          MR. THEISING:  -- so there may be some silence on

8    the line for a minute here --

9          MR. SANDBERG:  -- I object.

10         MR. THEISING:  -- before you get it and while the

11   Court looks at it.

12         MR. SANDBERG:  Well, counsel prepared this before he

13   came to court.  He had ample time to get it to me ahead of

14   time.  In the middle of the hearing?  I mean, I haven't -- I'm

15   not familiar with courts that allow things to be filed in the

16   middle of the hearing when they're prepared ahead of time.

17         MR. THEISING:  John, when you get it, you'll see

18   that it's dated today.  And, again, as I noted, you were the

19   one who requested an evidentiary hearing.

20         MR. SANDBERG:  What has that got to do with your

21   production?

22         MR. THEISING:  Do you have it?

23         MR. SANDBERG:  Well, I'm trying to sign in right now

24   because I'm in a conference room.

25         MR. THEISING:  All right.  I don't want --

1          MR. BLUE:  May we have that sent to counsel for the

2    bank as well, please?

3          MR. ARTHUR:  We'll send it to you, also, Greg.

4          MR. BLUE:  Thank you.

5          MR. SANDBERG:  Yeah, and, Judge -- and, again, I've

6    not experienced this in the middle of a hearing before that

7    we're going to take up new matters not -- you know, this

8    isn't -- wasn't part of your ruling that you could provide

9    affidavits, you know.  So, yes, I seriously object to this,

10   and it's just a trick by opposing counsel, you know, trying to

11   deceive me and the Court.

12         MR. THEISING:  John, you asked for the evidentiary

13   hearing.  That's why we're here.

14         MR. SANDBERG:  I haven't gotten the email yet.  Just

15   so you understand, it hasn't arrived.

16         MR. THEISING:  You're talking; I'm talking, too.

17         You're the one who asked for the evidentiary hearing.

18         MR. SANDBERG:  Yeah.

19         MR. THEISING:  And this is a hearing to reconsider

20   the Court's ruling.  I believe this is evidence that the Court

21   should consider in reconsidering its ruling.

22         And I'll talk for a little bit here, John, not about

23   the affidavit, but in general.  When you get it, it will all

24   tie together.

25         THE COURT:  What I'm going to deal with at this

1  stage, obviously, it is the case that things that are handed

2  to counsel in the middle of the hearing, I will normally give

3  some opportunity to respond to.  Like the issue of the *Phoenix*

4  documents --

5           MR. THEISING:  That's fine, Your Honor.

6           THE COURT:  -- John, I'll give you ten days to file

7  any response that you think is appropriate with respect to

8  that.

9           MR. SANDBERG:  Thank you, Judge.

10          MR. THEISING:  Do you have it, John?

11          MR. SANDBERG:  No.

12          MR. THEISING:  Okay.

13          MR. JESSE ROCHMAN:  I don't have it either.  This

14 is Jesse Rochman.

15          MR. THEISING:  Well, again, John, I'm just going to

16 talk, not about the affidavit but about the argument that I

17 want to make.

18          You've argued to the Court throughout this thing that

19 these tax returns are relevant because they show or ought to

20 show whether these notification and title search costs were in

21 fact incurred and paid.  You've indicated that the income --

22 that the reimbursement from the county should be recorded on

23 the 1040 on the first page and on Schedule C as business

24 income, and you've indicated in your briefs, you've indicated

25 in our previous conference before this hearing today that you

1   believe that those, to the extent that they were paid by

2   Mr. Gupta, should then be reflected, also, as expenses on

3   Schedule C.  So, obviously, it's a wash tax-wise.  If you show

4   the reimbursement as income and you show the expenditure as an

5   expense, it washes out, and the net effect on the tax return is

6   zero.

7           However, you've asked the Court -- and again I invite

8   everybody to go back and look at the briefs.  You've just asked

9   the Court to assume that that information is or ought to be on

10  a tax return.  In fact, John, it should not and should properly

11  not be included on a tax return, either as income or as

12  expense; it's a reimbursement.

13          So I'd submit to you, John, in the first place, it's

14  your burden, not mine, to demonstrate relevance.  It's your

15  burden as the person who's asking for this stuff, the tax

16  returns, to make some showing to the Court that it's relevant.

17  You simply asked the Court to assume that.  I'm demonstrating

18  to the Court that that's not the case.

19          Following along with what I was saying before, in

20  every other -- in every other instance where we've been able to

21  work out an agreement, John, you have limited your request to

22  matters that are pertinent to this lawsuit.  And so I see no

23  reason, John, why you shouldn't be willing -- and maybe the

24  Court should order that your request number seven should be

25  limited to ask for those parts of Mr. Gupta's tax returns which

1  include, show, exhibit, demonstrate that amounts received from

2  the county in reimbursement of title search costs and

3  notification costs for redeemed properties are income and that

4  amounts spent by Mr. Gupta, the incurred part, the amounts

5  spent to have that work done for properties that were redeemed,

6  and that your request should be so limited.

7         And if it is, then, as you said, that is the heart of

8  this case, those costs incurred and paid.  And if you limit

9  your request to those parts of the tax return which would show

10 or include or indicate that those amounts were on those tax

11 returns, then we can respond.  And if they are on the tax

12 returns, then you get it.  If they weren't, then you're going

13 to get the kind of response that Your Honor said we should do

14 for every other request, and that is to state that there are

15 none.

16         Your Honor, that seems to me to be the most

17 reasonable way to give Mr. Sandberg what he wants.  Again, you

18 hit the nail on the head; you said he's using the request for

19 production as an admission, so if his request is so limited to

20 only the information -- only the tax returns that show those

21 costs or those income for redeemed properties, if we say we

22 don't have any, then he got his admission.

23         And, Your Honor, it accomplishes everything that

24 we're talking about.  It gives him the evidence that he so

25 badly wants to use to argue to the jury and gives us the

 1   protection that we've been asking for.  We don't have to get

 2   undressed for our competitors.  We don't have to give them our

 3   tax return.

 4           We've told the Court Mr. Gupta has other business

 5   interests besides tax sale business in Indiana.  The Court

 6   knows what a Schedule C looks like.  There's one line on there

 7   for income from other businesses.  That could include all kinds

 8   of businesses, not just the business from the Indiana tax sale.

 9           So again, Your Honor, I would suggest that the

10   simplest and the way we've done everything else in the past and

11   it's totally consistent with the Court's order that that

12   request be so limited.  And if we have it, we'll give it to

13   them.  And if we don't, we'll so state.  And that way if we

14   don't have it, we don't have to undress Mr. Gupta to his

15   competitors.  That seems to me to be an absolutely, totally

16   reasonable way to address this.  It gives John what he's asking

17   for, and it gives us the protection that we're asking for.

18           And, John, hopefully you've received the affidavit by

19   now.  It eliminates the issue about relevance.  We don't think

20   it's relevant.  If you've got an expert who thinks it is, then,

21   by golly, we're going to have a good time at trial arguing

22   about that between our experts.

23           Your Honor, I have a couple of other concerns with

24   the Court's orders.  That is my biggest concern, Your Honor.

25           THE COURT:  Your primary concern is with request

1    number seven; is that what I understand?

2            MR. THEISING:  That's for the tax return.

3            And there are some other documents, Your Honor, that

4    we're talking about that we just found out about a couple of

5    days ago.  Mr. Sandberg has been trying to go behind our back

6    and get some documents from the bank that are financial

7    documents, but they basically just pull information off of his

8    tax returns.

9            So if they get those, it's the same thing as getting

10   his tax return, so it's the same thing.  His financial

11   statements and tax returns, it's the same thing, Your Honor.

12   And, again, I've tried to propose a solution that to me it

13   makes total sense; it's totally consistent with everything

14   John's done in the case and everything the Court's done in the

15   case and everything we've done in the case to try to

16   accommodate everybody's interests and get the information

17   that's important to this case, that's at the heart of this

18   case.

19           My other concerns, Your Honor, again have to do with

20   time.  I'm sure Mr. Sandberg is going to complain about what I

21   have to say, but the Court's order gave us ten days, as I read

22   it, to essentially go back through over 50,000 documents and

23   electronic records that have already been produced over the

24   past year in this case and identify by Bates number which ones

25   are responsive to which requests numbered 9 through 12, 15

1   through 20, and 27 through 29.  That is a Herculean task, Your

2   Honor, to accomplish in ten days, to sit down and go through

3   over 50,000 documents and electronic records, and that's just

4   what we've produced.  We're going to need more time than that.

5          The Court's order -- again, if I'm reading it right;

6   I don't want to put words in the Court's mouth, but I

7   understood the Court to say that we're supposed to go ask our

8   bank to give us the documents that Mr. Sandberg asked us for in

9   the request for production.  Now, he's already subpoenaed all

10  that stuff from the bank, and we told the Court in our briefing

11  that as far as we know, they've got everything straight from

12  the bank; it didn't even go through us.  But if I understand

13  the Court's order correctly, the Court wants us to go ask the

14  bank or banks, plural, for those documents again.  And I

15  have --

16         MR. SANDBERG:  I can point out one in particular

17  that we don't have from the bank.

18         MR. THEISING:  And my first -- if I may finish,

19  John, my first is, again, Your Honor, I don't think that is

20  realistic in ten days.  With all due respect to Greg, banks

21  just don't work that fast, and they certainly don't work that

22  fast with the tens of thousands of documents that they're

23  likely to have that are going to be responsive to these

24  requests.

25         I don't think we can do it in ten days, Your Honor.

1   We'll make a run, but I'm just letting the Court know that we

2   may be back because I don't think that's realistic.  But,

3   again, I don't want to belabor the point.  I think it's

4   duplicative; I think it's burdensome.  I don't know why we're

5   doing their discovery for them.  But if the Court wants us to

6   do it, we'll do it, but I don't think we can get it done in ten

7   days.

8          But the other thing, Your Honor, just as importantly,

9   we've talked about the horrible costs that our client is

10  incurring in defending this lawsuit.  Obtaining these documents

11  from banks is not going to be free; it's going to cost money.

12  They're going to want some time to pay their people to go

13  through the records.  They're going to want to be paid to

14  reproduce those records.

15         And since this is a request from the plaintiff, Your

16  Honor, if he really wants us to do it, we'd like the Court's

17  order to include a provision that they pay for it.  I just

18  don't think it's fair for Mr. Gupta to have to incur this

19  expense to basically do the plaintiff's discovery for them.  It

20  just doesn't seem fair to me.

21         Your Honor, those are my concerns.  I offer Exhibit

22  2, the affidavit of Robert Peck.  I believe it goes directly to

23  the issues that I discussed concerning the relevance of tax

24  returns in reflecting notification costs and title search and

25  whether or how they're reported on a tax return.  Everything

1  else on those tax returns, Your Honor, is irrelevant to this

2  case.

3           You heard John say it; this case is about title costs

4  and notification costs, whether they were incurred and paid.

5  Everything else on that tax return is confidential,

6  proprietary.  I guard it like my Social Security number, Your

7  Honor.

8           Thank you.

9           THE COURT:  All right.  Mr. Sandberg --

10          MR. SANDBERG:  Yeah, very briefly, Judge.

11          THE COURT:  -- response?

12          MR. SANDBERG:  First of all, I will respond about

13  the affidavit when I have time to study it, but I think

14  counsel is trying to mislead the Court with this affidavit.

15  And why?  It's because he -- the CPA points out, well, you

16  don't need to list the amount from the revenue from the county

17  because it just offsets the expense, and, therefore, it's a

18  wash.  Well, you know --

19          MR. THEISING:  That's not what it says, John.

20          MR. SANDBERG:  What?

21          MR. THEISING:  That's not what the affidavit says.

22          MR. SANDBERG:  Well, it says that it -- you know, it

23  doesn't need to be reported as income or expense.  That's what

24  I read.  You know, let me find it, unless I misread it because

25  I'm reading fast.  Yeah, it's improper to report the bid price

1   notice costs and title examination costs on the purchaser's

2   income tax returns as expenses when incurred or later as

3   reported income when reimbursed.  That's what I just said,

4   different words.  That's paragraph 13.

5           MR. THEISING:  Well, keep reading.

6           MR. SANDBERG:  Well -- well, again he says it's

7   suspended.  This is a cash-based taxpayer.  If he has advanced

8   costs or received income that's not properly matched at that

9   time, he still needs to report it as an asset or a liability.

10          MR. THEISING:  Are you a CPA, John?  Are you

11  testifying?

12          MR. SANDBERG:  No.  I've taken 12 hours of

13  accounting classes, so I'm not a CPA, but I took plenty of

14  accounting.

15          MR. THEISING:  (inaudible)

16          MR. SANDBERG:  I took six hours of basic accounting

17  and six hours, credit hours, so this is almost an entire

18  semester of accounting in undergrad.  So, yes, I have a lot of

19  knowledge about accounting.

20          THE COURT:  I'd like to remind the parties, I can

21  only listen to one at a time, so, Mr. Theising, you'll have to

22  wait until Mr. Sandberg is done.

23          Mr. Sandberg.

24          MR. SANDBERG:  You know, and, again, so I think we

25  still need to see the tax returns and the financial

 1   statements.  This affidavit doesn't appear to go to the

 2   financial statements, just the tax returns, of which we

 3   haven't asked for the whole tax returns:  Copy of page one

 4   plus Schedule C, a limited request.

 5          And the financial statements undoubtedly will have

 6   more information than the tax returns.  Again, counsel has

 7   claimed we want to undress his client, that it is essential

 8   information, that it's proprietary.  It's got to be information

 9   that could cause him harm if disclosed.  That's what the cases

10   say, an injury, and they have defined no injury.

11          The final thing, Judge, we did ask in our motion for

12   attorney's fees per the rule, and the Court did not address

13   attorney's fees in its ruling.

14          MR. JESSE ROCHMAN:  Your Honor, this is Jesse

15   Rochman.  I'm just going to add one thing.  You know, as

16   everybody recognizes, we're here potentially, I guess, on a

17   reconsideration of that order.  We agreed the standard for

18   reconsideration and it's solely allowed in limited

19   circumstances, and one of them is not to pose new arguments

20   that could have been raised in the original briefing.

21          In defendants' original briefing, they never raised

22   this issue that they are not properly listed on the tax

23   returns.  Rather, they created some argument that they're just

24   inference neutral where if they were listed, it wouldn't

25   show -- they're shown in the aggregate, so no inferences could

1    be properly drawn from it.  I would think it would be improper

2    to allow them to raise this argument at this time, too.

3    (inaudible)

4            THE COURT:  All right.

5            MR. THEISING:  I'll reply to that very briefly, Your

6    Honor.  The very first sentence of our objection to request

7    number 7 was relevancy.  That was the very first sentence of

8    the page-long objection to that request.  We've argued this

9    throughout.

10           Again, Your Honor, this was an evidentiary hearing to

11   reconsider the Court's order.  I just -- I just got this

12   affidavit today, Your Honor.  I've known -- I don't know that

13   I've known; I've suspended all along that this is the law, but

14   I just found out about it.

15           If Mr. Sandberg wants to get an expert to say

16   something different, then we're going to have a fun time.  But,

17   again, Your Honor, if you limit the request the way I

18   suggested, those experts can argue all day because if it's

19   not -- if it's limited only to the title costs and notification

20   costs reflected on Mr. Gupta's income tax returns for

21   properties that have been redeemed, if we have them, we'll

22   produce them.  If we don't, we'll say we don't have them; and

23   Mr. Sandberg can continue to make the argument that they should

24   be on there; they should be reflected.  He can have his expert

25   testify till the cows come home that it should be on there, and

1   he's got our admission that they're not on there.

2         The harm in undressing for two competitors of

3   Mr. Gupta far, far outweighs any, any possible probative value

4   of everything else on those tax returns.  We have made that

5   argument.  We've made it from the beginning.  I just got this

6   evidence.  I'm sure when Mr. Sandberg talks to an accountant,

7   he's going to learn the same thing.

8         Again, Your Honor, it bothers me.  It should bother

9   the Court that Mr. Sandberg is not willing to accept the

10  proposal that I've made because this is what we've done on

11  everything else.  There's something else in those tax returns

12  that he wants, and that's what Mr. Arthur has been telling this

13  Court from the first day.  They want the competitive advantage

14  of that information that can put our client out of business.

15  That's what they really want.

16        If all they wanted was to know whether those tax

17  returns included the notification costs and title search costs,

18  they'd go along with the proposal that I just made and have

19  asked the Court to do.

20        THE COURT:  Well, let me do this:  At this point in

21  time, then, what I'm going to do is I will give you all ten

22  days to submit any portions of the *Phoenix* records that you

23  think I need -- each of you think I need to consider.  I will

24  give, Mr. Sandberg, you all ten days, as well.

25        The reason I'm keeping the times fairly short is my

1  experience that discovery orders go out from the Court and

2  they're never perfect.  And lawyers generally have to deal with

3  those imperfections and find some way to keep the case moving

4  forward.  If we want to litigate every order that's a discovery

5  order, then this case doesn't go to trial for two, three or

6  four or five years by the time we each brief every aspect; you

7  get a magistrate judge's ruling; then there's the appeal to the

8  District Court.  It gets rebriefed again; the District Court

9  judge then does that.  You can take any lawsuit and create a

10 five- or ten-year lawsuit out of doing that.

11        My understanding of my job is, given the amounts at

12 issue and the parties' various resources, I have to construct

13 some less-than-perfect discovery mechanism that allows the

14 parties to get to the essential documents and get those out.

15        Now, I think there's one thing I would correct a

16 little bit.  At least, Mr. Theising, I don't understand my

17 argument or my order to require you to make a re-search of

18 50,000 documents again to do what you do.  I'm looking at page

19 21 of the order that talks about the various ways to respond.

20        MR. THEISING:  Uh-huh.

21        THE COURT:  My understanding is that when there's a

22 large production of records, 50,000 records in response to a

23 particular request for production, it's not a sufficient

24 answer to say, "We've given you 50,000 documents.  They're in

25 there someplace.  You guys can find them," and that the Court

 1   does require the party who produces the records to either show

 2   which generalized categories, which Bates numbers generally

 3   apply to which categories in that regard.  Or they can say,

 4   you know, "Come see them.  Here's the way they're kept in the

 5   scope of business."  You come see them, and you can do that.

 6   But they can't simply say, "They're in there someplace."

 7          At page 21, again, I start with, "Again, Vinod should

 8   respond in one of three ways.  If no document exists, Vinod

 9   should respond by stating that none exists."  And if you do

10   that, you have responded to that category.  If such documents

11   exist and in fact they were produced in response to previous

12   requests, you simply say -- and I don't have to copy them, give

13   them you to again.  You simply say, "They are at Bates number"

14   thus and so, if they exist.

15          And, of course --

16          MR. THEISING:  Doesn't that mean we have to go

17   through them?

18          THE COURT:  And, of course, if there are documents

19   that exist -- well, in going through them, yes, but I guess my

20   belief is that you would likely be able to do that by some

21   sort of rough categories:  The documents are within the

22   following 200 pages or the following locations.  I think --

23   I'm not sure you have to respond with a page-by-page number,

24   but the -- while, yes, you do have to go through those, my

25   belief is that you do not have to go through them on a

1   page-by-page response.  You would simply say, "They are within

2   Bates numbers" here to here.  If the mechanism that the record

3   keeper used was simply to throw each piece of paper in a room

4   and they were Bates numbered irrespective of any categories of

5   any description, it's one check followed by one email followed

6   by one something --

7           MR. THEISING:  Your Honor, we previously represented

8   to the Court that we produced them as they're kept in the

9   ordinary course of business.

10          THE COURT:  -- then you may be stuck in that regard,

11  but it was not my intention.

12          And with respect to whether they have to be produced

13  a second time, I go to page 23 of the order at the top of the

14  page, "However, the Court is persuaded that he not reproduce

15  documents that have been produced once already."  So if there

16  are responsive documents to any category that have been

17  produced by the bank already, he can say, "The bank has

18  produced these to you at" thus and so description or location,

19  and then he needs not reproduce those same items again so long

20  as he is producing those very same bank records.

21          So my belief is that this order was intended to make

22  the response by Vinod not as burdensome but at the same token

23  require you to identify in some more specific way where within

24  the 48,000 documents are these things found.

25          So I'm not sure -- realizing that you all just

1   received the order yesterday, I can understand there might be a

2   little sorting through that has to be done.  So that was the

3   intention there.  But what I will do is await ten days from

4   each of you to see those remaining documents and then try to

5   issue an order fairly promptly as to whether there's going to

6   be a change in that order.

7          To the extent that you all want to file those

8   documents, these other additional documents or respond in some

9   regard, it may also be helpful for me for each of you to

10  propose what my new order is to look like because I've had some

11  suggestions, well, if you just change request number seven to

12  this or you just change this, I would probably like to hear

13  from each of you as to what the new order should say, if

14  anything, about those to the extent neither side likes that.

15  Because it will be, again, something that I don't generally do,

16  which is just think about all of those things again and come up

17  with a better way, I'm going to need to be fairly specifically

18  pointed to the way you think I have to restructure that

19  particular portion of the order.  So I'll certainly await and

20  hear what you have to say.

21          Otherwise, I am going to treat it like a motion to

22  reconsider.  My understanding is the standards for that,

23  as Jesse Rochman suggested, are not think about it again, but I

24  have to be -- I have to be shown that I was clearly erroneous

25  factually, that there was some fact that I misapprehended or

 1   that there's a piece of law that I misapplied clearly.  And if

 2   I don't have one of those two things, then you're just stuck

 3   with an imperfect order.  And particularly in this area where

 4   there is an appeal to the District Court judge, I don't spend

 5   very much time on motions to reconsider.

 6            MR. SANDBERG:  I can understand that, Judge.

 7            MR. THEISING:  Should we consider your order

 8   suspended until the ten days have run if John has to appeal?

 9            THE COURT:  I will, because of the need to deal with

10   that, stay the requirement of the production for another --

11            MR. THEISING:  I meant for appeal purposes.

12            THE COURT:  For appeal purposes, yeah, yeah, at this

13   stage.

14            MR. THEISING:  We'll get to work on the production.

15   Was that yes, Your Honor?

16            THE COURT:  Yes, that was a yes.

17            MR. THEISING:  Okay.

18            THE COURT:  That was a yes.

19            All right.  Then anything else, Mr. Sandberg,

20   Mr. Rochman, from on the phone, anyone else, something we

21   should address today?

22            MR. SANDBERG:  No, Judge.

23            THE COURT:  Okay.  Anything else, Mr. Theising,

24   Mr. Arthur?  Anything else we need to --

25            MR. THEISING:  Your Honor, I guess we didn't respond

1  directly to the request by Mr. Sandberg at the very end there

2  about fees, but it appears that the Court granted in part and

3  denied in part both motions, and so it would seem to me just

4  by way of response that award of fees is not in order --

5          THE COURT:  Yeah.

6          MR. THEISING:  -- or it goes both ways, I guess.

7          THE COURT:  Yeah.  No fees were intended to be

8  awarded because there was a granting in part and a denying in

9  part, so the intention of the order was not to allow fees to

10  either side under those circumstances, but that's something

11  you could take up with the District Court judge.

12          I will tell you that historically in this district,

13  motions for those are held under advisement until the case is

14  resolved because if the parties can resolve it without the

15  Court deciding it, fine.  In the end if there's a final

16  judgment and an order issued, then we have to address the issue

17  of whether that final order includes some additional fees or

18  not.

19          But historically those are taken under advisement

20  until the end of the case, absent a showing of extraordinary

21  bad faith and absent a circumstance in which one side has a

22  significant financial advantage over the other such that the

23  denial of those fees would effectively preclude one side from

24  continuing the fight compared to the other side.  And

25  occasionally the judge will then decide, no, I've got to order

1   them now to keep the thing afloat.  That's probably not the

2   case here.

3           So thank you gentlemen very much.  I will mark my

4   calendar for essentially ten days or so, so I'll be looking to

5   hear from you roughly the 18th of Novemberish or so.  And then

6   we will see where we go from there.

7           All right.  Thanks very much.

8                   (Audio ends at 5:00 p.m.)

9               CERTIFICATE OF REPORTER

10

11      I, Judy Farris Mason, Official Reporter for the United
    States District Court, Southern District of Indiana, 318
12  Federal Building, Evansville, Indiana 47708, hereby certify
    that the foregoing transcript constitutes a true, full, and
13  correct transcript of the audiotape made of the proceedings
    hereinbefore entitled, at which I was not present, and reduced
14  to typewriting by computer to the best of my ability.

15

16  s/Judy Farris Mason                 November 13, 2013
     Judy Farris Mason, CSR

17

18

19

20

21

22

23

24

25

Judy Farris Mason, CSR