1                 UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA

2                   TERRE HAUTE DIVISION

3

4  JOSHUA B. CRISSEN,          )
    individually and on behalf of )
    all others similarly situated )

5                            )

              Plaintiff,     )

6                            )

       vs.             ) Case No.

7                            ) 2:12-cv-00355-JMS-WGH

8  VINOD C. GUPTA, SATYABALA V. )
    GUPTA, WIPER CORPORATION,    )

9  VIVEK GUPTA, and BANCO      )
    POPULAR NORTH AMERICA,      )

10                          )

           Defendants.     )

11

12

13     VIDEOTAPED DEPOSITION OF BARRETT ROCHMAN

14     TAKEN ON BEHALF OF THE DEFENDANTS

15           JANUARY 10, 2014

16

17

18

19

20

21

22       CERTIFIED COPY

23

24

25

EXHIBIT
A

1/10/2014  BARRETT ROCHMAN

1                        I N D E X

2
   QUESTIONS BY:                                    PAGE
3
   Mr. Wolson                                          7
4  Mr. Arthur                                         90
   Mr. Sandberg                                      126
5

6

7
                        E X H I B I T S
8

9  NUMBER           DESCRIPTION                      PAGE

10 Exhibit 81       Billing information               26
                    Bates number JC2577
11 Exhibit 82       Sandberg Phoenix Invoice #228054  40
   Exhibit 83       Sandberg Phoenix Invoice #265611  63
12 Exhibit 84       Sandberg Phoenix Invoice #262751  65
   Exhibit 85       Sandberg Phoenix Invoice #268163  71
13 Exhibit 86       Sandberg Phoenix Invoice #271049  76
   Exhibit 87       Sandberg Phoenix Invoice #272109  83
14 Exhibit 88       Stipulation of Facts              86
                    Case 3:13-cr-30222-DRH
15

16

17

18

19

20

21

22

23

24

25

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                     TERRE HAUTE DIVISION

 3
      JOSHUA B. CRISSEN,              )
 4    individually and on behalf of )
      all others similarly situated )
 5                                    )
                   Plaintiff,         )
 6                                    )
           vs.                        ) Case No.
 7                                    ) 2:12-cv-00355-JMS-WGH
                                      )
 8    VINOD C. GUPTA, SATYABALA V.    )
      GUPTA, WIPER CORPORATION,       )
 9    VIVEK GUPTA, and BANCO          )
      POPULAR NORTH AMERICA,          )
10                                    )
                   Defendants.        )
11
```

12          Videotaped Deposition of Barrett Rochman,

13    produced, sworn, and examined on January 10, 2014,

14    beginning at 1:24 in the afternoon, at the office

15    of ARMSTRONG & GREEN, 400 North Market Street, Marion,

16    Illinois, before Joanna Charlton, RPR, CCR(MO),

17    CSR(IL), in a certain cause now pending in the United

18    States District Court, Southern District of Indiana,

19    Terre Haute Division, in re:  JOSHUA B. CRISSEN vs.

20    VINOD C. GUPTA, et al.; on behalf of the Defendants.

21

22

23

24

25

```
1                    A P P E A R A N C E S
2
                 FOR THE PLAINTIFF:
3
                     John Sandberg, Esq.
4                    SANDBERG PHOENIX & von GONTARD, PC
                     600 Washington Avenue
5                    15th Floor
                     St. Louis, Missouri 63101
6                    (314) 231-3332
                     jsandberg@sandbergphoenix.com
7
8                FOR THE BANCO POPULAR NORTH AMERICA:
9                    Joshua Wolson, Esq.
                     DILWORTH PAXSON, LLP
10                   1500 Market Street
                     Suite 3500E
11                   Philadelphia, Pennsylvania 19102
                     (215) 575-7000
12                   jwolson@dilworthlaw.com
13
                 FOR THE DEFENDANTS VINOD AND SATYABALA
14               GUPTA AND WIPER CORPORATION:
15                   Stephen Arthur, Esq.
                     HARRISON & MOBERLY, LLP
16                   10 West Market Street
                     Suite 700
17                   Indianapolis, Indiana 46204
                     (317) 639-4511
18                   sarthur@harrisonmoberly.com
19
                 FOR THE DEFENDANT VIVEK GUPTA:
20
                     David Friedrich, Esq.
21                   WILKINSON, GOELLER, MODESITT,
                     WILKINSON & DRUMMY, LLP
22                   333 Ohio Street
                     Terre Haute, Indiana 47808
23                   (812) 232-4311
                     dpfriedrich@wilkinsonlaw.com
24
25
```

1           A P P E A R A N C E S   C O N T I N U E D

2

        FOR MR. BARRETT ROCHMAN:
3

            Stephen Green, Esq.
4           ARMSTRONG & GREEN
            400 North Market Street
5           Marion, Illinois 62959
            (618) 993-6072
6           sgreen111@frontier.com

7

    Court Reporter:
8   Joanna Charlton, RPR, CCR(MO), CSR(IL)

9   Video Technician:
    Taedra Hickam

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1            IT IS HEREBY STIPULATED AND AGREED by and
2    between counsel for the Plaintiff and counsel for the
3    Defendants that this deposition may be taken in
4    shorthand by Joanna Charlton, RPR, CCR(MO), CSR(IL) and
5    afterwards transcribed into printing, and signature by
6    the witness expressly reserved.
7                        *  *  *  *  *
8            THE VIDEOGRAPHER:  Here begins videotape
9    number one in the deposition of Barrett Rochman in the
10   matter of Joshua Crissen versus Vinod Gupta, et al. in
11   the United States District Court, Southern District of
12   Indiana, Terre Haute Division.  The Case Number is
13   2:12-cv-00355-JMS-WGH.  Today's date is January 10,
14   2014.  The time on the video monitor is approximately
15   1:24 p.m.  This is -- the video operator today is
16   Taedra Hickam of CaseWorks, Inc.  The video deposition
17   is taking place at the office of Armstrong and Green,
18   400 North Market Street, Marion, Illinois 62959.
19   Counsel, please state your names for the record and
20   whom you represent.
21            MR. SANDBERG:  John Sandberg for Josh
22   Crissen.
23            MR. FRIEDRICH:  Dave Friedrich, Vivek Gupta.
24            MR. ARTHUR:  Stephen Arthur, Vinod Gupta,
25   Satyabala Gupta, and Wiper Corporation.
```

1            MR. WOLSON:  Josh Wilson for Banco Popular
2     North America.
3            MR. GREEN:  Steve Green, attorney for
4     Barrett Rochman.
5            MR. WOLSON:  Good afternoon, Mr. Rochman.
6     Oh, I'm sorry.
7            THE VIDEOGRAPHER:  The court reporter today
8     is Joanna Charlton of CaseWorks, Inc.  Would the court
9     reporter please swear in the witness?
10                    BARRETT ROCHMAN,
11    of lawful age, produced, sworn, and examined on behalf
12    of Defendants, deposes and says:
13                       EXAMINATION
14    QUESTIONS BY MR. WOLSON:
15        Q.    Try that again.  Good afternoon,
16    Mr. Rochman.
17        **A.    Good afternoon.**
18        Q.    You've been deposed before?
19        **A.    Yes.**
20        Q.    So you're familiar with the process.  I'm
21    just going to go over a couple of the ground rules real
22    quick as a refresher.  You understand you're under oath
23    today?
24        **A.    Yes.**
25        Q.    And you have to answer questions verbally.

1    Nods, shakes of the head, things like that don't work;

2    do you understand that?

3         **A.   I understand that.**

4         Q.   Okay.  Try and let me finish my questions.

5    I'll try and let you finish your answers.  It's tough

6    with someone new, but if I step on your answer, let me

7    know.  And I'll let you finish.  Okay?

8         **A.   Yes.**

9         Q.   And if you don't understand something I've

10   asked, let me know.  If you answer, I'll assume you

11   understood; fair?

12        **A.   Yes.**

13        Q.   Okay.  You understand you're testifying

14   pursuant to a subpoena today?

15        **A.   Yes.**

16        Q.   Okay.  Did you do anything to prepare for

17   the deposition?

18        **A.   Yes.**

19        Q.   What'd you do?

20        **A.   Talked to my attorney Steve Green.**

21        Q.   Okay.  Did you talk to anyone else?

22        **A.   No.**

23        Q.   Okay.  Look at any documents?

24        **A.   No.**

25        Q.   How long did you talk to Mr. Green?

1        **A.    A range of 20 to -- 20 minutes to 30 minutes**

2  **and today maybe 15 minutes.**

3        Q.    Okay.  Have you had occasion in the past to

4  participate in tax sales in Indiana?

5        **A.    Yes.**

6        Q.    In what capacity?

7        **A.    Research and buying.**

8        Q.    What do you mean by research?

9        **A.    Reviewing properties, reviewing deeds,**

10  **grantor/grantee books, reviewing generally like that,**

11  **sir.**

12        Q.    And buying you're talking about buying tax

13  sale certificates?

14        **A.    Yes, sir.**

15        Q.    When you have participated in tax sales in

16  Indiana, what capacity has it been in?

17        **A.    As a buyer.**

18        Q.    Has it been personally or through a

19  corporate entity?

20        **A.    I'm not sure.  It -- it may have been both.**

21        Q.    Okay.  Have you bought tax sales

22  certificates in Indiana personally?

23        **A.    I may have.**

24        Q.    Have you brought them through corporations?

25        **A.    LLCs.**

1          Q.    Okay.  Can you tell me what companies you've

2     purchased tax sales certificates in Indiana through?

3          A.    Sabre Group possibly.  I -- I can't be

4     absolutely certain.

5          Q.    Okay.

6          A.    Okay.  Sabre Ventures, Sabre Investments,

7     and maybe Barrett Rochman.

8          Q.    Barrett Rochman personally?

9          A.    Yes, maybe.

10         Q.    Okay.  Are you familiar with an entity

11    called SI Securities?

12         A.    Yes.  And SI securities could've been one,

13    too.

14         Q.    Okay.

15         A.    Thank you.

16         Q.    How about SI Resources?

17         A.    That could be one of them, too.

18         Q.    How about SIPI?

19         A.    I -- it could be one, but I don't recall

20    that.

21         Q.    Okay.  You're familiar with that entity?

22         A.    Yes.

23         Q.    Okay.  Are you familiar with one that's ROC

24    Enterprises?

25         A.    Yes.

1      Q.    And is that one that could have participated

2  in tax sales in Indiana?

3      **A.    It's possible.**

4      Q.    Are you familiar with an entity called

5  Barrett Rochman Company?

6      **A.    Yes.**

7      Q.    And is that one that could've participated

8  in tax sales in Indiana?

9      **A.    It's possible.**

10     Q.    Are there any others, any other entities

11  that you can think of?

12     **A.    Not that I recall.**

13          MR. SANDBERG:  You might want to keep your

14  hands away from your mouth.

15     **A.    Oh, I'm sorry.  Okay.  Not that I recall.**

16     Q.    (BY MR. WOLSON)  Are there any -- any

17  members of your individual family -- immediate -- let

18  me -- let me start over.

19          Are there any members of your immediate

20  family who you know have purchased or participated in

21  tax sales in Indiana?

22     **A.    Yes.**

23     Q.    Who's that?

24     **A.    James Rochman and Chris Rochman.**

25     Q.    What relation are they to you?

1          A.   Sons.

2          Q.   Who's Marilyn Rochman?

3          A.   That's my wife.

4          Q.   Has she ever participated in a tax sale in

5     Indiana?

6          A.   No, sir.

7          Q.   You have a son Jessie?

8          A.   Yes.

9          Q.   Has he ever participated in a tax sale in

10    Indiana?

11         A.   No, sir.

12         Q.   You mentioned Sabre Group as one of the

13    entities that might have participated in tax sales in

14    Indiana; right?

15         A.   It may have.

16         Q.   Okay.  Who owns Sabre Group?

17         A.   Myself and Charles Decker.

18         Q.   Who's Charles Decker?

19         A.   He is a partner.

20         Q.   Is he a relation of yours?

21         A.   No, sir.

22         Q.   Are you a majority owner of Sabre Group?

23         A.   No.

24         Q.   Is it 50/50?

25         A.   Yes, sir.

1       Q.  Has your son Jessie ever had any ownership

2  interest in Sabre Group?

3       **A.  No, sir.**

4       Q.  Has your son Jessie ever had any management

5  responsibility for Sabre Group?

6       **A.  No, sir.**

7       Q.  How about Sabre Investments, who owns that?

8       **A.  I believe my wife Marilyn Rochman and Chuck**

9  **Decker's wife Sutton.**

10       Q.  I'm sorry, Sutton?

11       **A.  Sutton.**

12       Q.  Sutton is her first name?

13       **A.  Yes.**

14       Q.  Okay.  Are they 50/50 owners?

15       **A.  Yes.**

16       Q.  Has your son Jessie ever had an ownership

17  interest in Sabre Investments?

18       **A.  No, sir.**

19       Q.  Has your son Jessie ever had any management

20  responsibility for Sabre Investments?

21       **A.  No, sir.**

22       Q.  Who owns Sabre Ventures?

23       **A.  My wife and Sutton.**

24       Q.  Is it 50/50 again?

25       **A.  Yes, sir.**

1          Q.    And has your son Jessie ever had any

2    ownership interest in Sabre Ventures?

3          **A.    No, sir.**

4          Q.    Has he ever had any management

5    responsibility in Sabre Ventures?

6          **A.    No, sir.**

7          Q.    Who owns SI Securities?

8          **A.    Charles Decker and Barrett Rochman.**

9          Q.    Is it 50/50?

10         **A.    Yes, sir.**

11         Q.    As your son Jessie ever had an ownership

12    interest in that entity?

13         **A.    No, sir.**

14         Q.    Has he ever had any management

15    responsibility?

16         **A.    No, sir.**

17         Q.    We talked about SIPI.  Is that an LLC?

18         **A.    Yes, sir.**

19         Q.    And who owns that entity?

20         **A.    Barrett Rochman and Charles Decker.**

21         Q.    And is it 50/50?

22         **A.    Yes, sir.**

23         Q.    And has your son Jessie ever had an

24    ownership interest in that entity?

25         **A.    No, sir.**

1     Q.   Has he ever had any management

2   responsibility?

3     **A.   No, sir.**

4     Q.   Who owns ROC Enterprises?

5     **A.   I'm not sure.**

6     Q.   Do you have an ownership interest in ROC

7   Enterprises?

8     **A.   Without calling my son Ken I wouldn't know.**

9   **I may have but I don't know.**

10     Q.   Do you exercise any control over ROC

11   Enterprises?

12     **A.   I manage it.  No, I'm sorry.  I don't even**

13   **manage it anymore.  I -- it's an LLC to bid its sales,**

14   **and I'm not sure what my involvement is in it.**

15     Q.   Did you manage it at one time?

16     **A.   I believe I was a manager.**

17     Q.   Do you know what timeframe?

18     **A.   No, sir.**

19     Q.   Who owns SI Resources?

20     **A.   That'd be Sutton -- Sutton Decker and**

21   **Marilyn Rochman.**

22     Q.   And does your son Jessie have any ownership

23   interest in that entity?

24     **A.   No, sir.**

25     Q.   Has he ever had any management

1    responsibility for it?

2         A.   No, sir.

3         Q.   Who owns Barrett Rochman Company?

4         A.   At this point in time, I'm not sure.

5         Q.   Was there a point at which you had an

6    ownership interest in Barrett Rochman Company?

7         A.   I am not -- this has all been graphed out.

8    There are so many different LLCs, and I'm not sure who

9    I am to that particular company.

10        Q.   Okay.  As amongst the entities that we just

11   listed, how do you determine which of them will bid at

12   a particular tax sale?

13        A.   It is normally the SI groups that bid at a

14   tax sale.  It's when we need -- when you're allowed

15   extra buyers the other LLCs come into play.

16        Q.   Just explain what you mean by when you need

17   extra buyers.

18        A.   If you're interested in a certain product

19   and you know the bid is going to be a constant, let's

20   just say zero in Illinois, and there's going to be ten

21   people in a room, you send five companies.  You have a

22   50 percent chance of getting that product.  Every so

23   often you want that particular tax lien to weigh the

24   room on the percentages.  In Indiana you don't have to

25   do that.  You bid dollars.

1      Q.   Over the past five years, how many times

2  have you participated in a tax sale in Indiana?

3          MR. SANDBERG:  I take it -- it's a little

4  unclear.  You mean where he personally appeared at a

5  tax sale?

6      Q.   (BY MR. WOLSON)  Well, let's start with

7  that.

8          MR. SANDBERG:  All right.

9      **A.   Okay.  This'll be a qualified --**

10  **speculation, 10 to 15 times.**

11      Q.   (BY MR. WOLSON)  And have there been other

12  occasions when you have directed someone else to

13  participate in a tax sale in Indiana?

14      **A.   Yes.**

15      Q.   How many times in the last five years?

16      **A.   Five to 15.**

17      Q.   And when you've directed other people to

18  participate, can you tell me who those people have

19  been?

20      **A.   James Rochman, Chris Rochman, and I think**

21  **that's it.**

22      Q.   Are there particular individuals who you

23  consider to be competitors at tax sales in Indiana?

24      **A.   Could you rephrase?**

25      Q.   Are there any individuals -- let me -- let

1     me start over.

2             Is there anyone who you consider to be a

3     competitor, a routine competitor of yours at tax sales

4     in Indiana?

5         A.    **Everyone who shows up.**

6         Q.    Is there anyone who has been a competitor on

7     a repeat basis that you're aware of?

8         A.    **That I recall?**

9         Q.    Yes.

10        A.    **Chris from Halifax, William Groom from --**

11    **Vickie and William Groom and Mr. Gupta.**

12        Q.    Anyone else?

13        A.    **Not that I recall.**

14        Q.    Were there any tax sales that you and

15    Mr. Gupta both attended personally that you recall?

16        A.    **I recall a few sales, yes.**

17        Q.    Do you remember when those were?

18        A.    **No, sir.**

19        Q.    Have you ever spoken with Mr. Gupta?

20              MR. SANDBERG:  At --

21        Q.    (BY MR. WOLSON)  At tax sales.

22              MR. SANDBERG:  At any time or at a tax sale?

23        Q.    (BY MR. WOLSON)  Well, let's start with at a

24    tax sale.

25        A.    **Very minor pleasantries.**

1      Q.   Other than at a tax sale, have you spoken

2  with him?

3      A.   Again, minor pleasantries.

4      Q.   Where would that have taken place?

5      A.   Wait.  Could you repeat the question, I'm

6  sorry?

7      Q.   Well, I started with other than at a tax

8  sale have you spoken with him.

9      A.   Other than a tax sale.  I was in a courtroom

10  with him in Jackson -- not in Indiana.  Is this Indiana

11  only?

12      Q.   No.

13      A.   A courtroom in Jackson County, maybe a

14  telephone call but I can't recall when.  This is over

15  how many years' time?

16      Q.   Call it the last five years.

17      A.   Other than a tax sale, most of our

18  conversations have been through attorneys.

19      Q.   What was the occasion that you were both in

20  a courtroom in Jackson County?

21      A.   A piece of property that was being

22  contested.

23      Q.   And what was the context that led to the

24  phone call that you had with Mr. Gupta?

25      A.   Actually, I don't recall.  I just remember

1    having a call.

2         Q.    Do you remember what you talked about?

3         A.    No, sir.

4         Q.    Have you ever had a conversation with anyone

5    about Mr. Gupta as a competitor at Indiana tax sales?

6              MR. GREEN:  Well, I'd ask you to clarify.

7    You're asking in a limited sense conversations about

8    him only as a competitor as opposed to other

9    conversations?

10             MR. WOLSON:  Yes.  I'm asking whether he's

11   had conversations about Mr. Gupta as a competitor.

12        A.    Competitors talk about -- it's a gossipy

13   group.  They talk about everybody the minute the person

14   is not there is being talked about.

15        Q.    (BY MR. WOLSON)  So that means you have

16   spoken with other people about Mr. Gupta?

17        A.    I -- I believe there has been a

18   conversation.

19        Q.    Can you tell me with whom?

20        A.    Actually not, no, sir.

21        Q.    Have you ever spoken to anyone about

22   Mr. Gupta's wife?

23        A.    No, sir.

24        Q.    You ever spoken to anyone about Wiper

25   Corporation as a competitor?

1    **A.    No, sir.**

2    Q.    Okay.  Have you ever had a conversation with

3    anyone about Mr. Gupta's relationship with Banco

4    Popular?

5    **A.    No, sir.**

6    Q.    Have you ever had a discussion with anyone

7    about Mr. Gupta's practices with respect to charging

8    notification costs in connection with redemption of

9    property in Indy?

10   **A.    With my attorney in Indiana.**

11   Q.    Who's your attorney in Indiana?

12   **A.    Wayne Gleason -- Gleason -- Gleason.**

13   Q.    When was that conversation?

14   **A.    Three, four years ago.**

15   Q.    What prompted it?

16   **A.    After I reviewed a 137(b) document.**

17   Q.    Was there something on the 137(b) document

18   that prompted you to speak with your attorney?

19   **A.    Yes.**

20   Q.    What was that?

21   **A.    A requirement -- there was an affidavit that**

22   **required that you had incurred and paid attorney and**

23   **abstract fees.  Prior to signing that document, you had**

24   **to have incurred those fees.**

25   Q.    Why did that prompt you to contact an

1     attorney?

2         **A.   First off, I wasn't going to sign that**

3     **document unless I incurred and paid those fees.**

4     **Secondarily, because you are compensated back the**

5     **money -- now I'm talking about what I'd be talking to**

6     **my attorney about.  I'm not sure that I --**

7         Q.   No, I don't want you to do that.

8         **A.   Okay.**

9         Q.   Let --

10         **A.   Then I don't --**

11         Q.   Let me -- let me go back because I -- I

12     kicked this off -- this line of questioning off with a

13     question had you ever spoken to anyone about

14     Mr. Gupta's practices with respect to charging

15     notification costs.

16         **A.   I believe we talked about in general, and I**

17     **named the three names I mentioned in general what do**

18     **you think people are doing in this area.  It was a**

19     **generalistic conversation.**

20         Q.   And you talked both about the title costs

21     and the notification costs?

22         MR. GREEN:  He isn't going to testify as to

23     what he talked to his attorney about.  You can ask him

24     a different question.

25         MR. WOLSON:  Well, I think I'm entitled to

1    the foundational level of detail.

2           MR. GREEN:  That is not the question you

3    asked him.

4           MR. WOLSON:  It is the question I asked him.

5    Topologically it is the question I asked him, Steve.

6    He already has testified that he talked to the lawyer

7    about notification costs.  I'm not sure how asking

8    about title costs is any different.

9           MR. GREEN:  That's not what you asked.

10          MR. WOLSON:  I asked whether he had spoken

11   about notification and title costs.  I'm not asking

12   what advice he got.  I'm asking the subject matter.

13   That's the same information that would be on a

14   privilege log.

15          MR. GREEN:  I think that what he talked

16   about to his attorney about at this level is something

17   that is confidential.  You have the general nature of

18   what he discussed with his attorney.

19          MR. WOLSON:  All right.  Well, we can mark

20   that down and consider whether to litigate it.

21       Q.  (BY MR. WOLSON)  When you participate in tax

22   sale auctions in Indiana, do you fund the purchases

23   personally?

24       A.  **They're bank funded.**

25       Q.  What bank funds them?

1      A.   Different banks for different companies at

2    different years.  Can I drink a soda while we're

3    talking?

4      Q.   Of course.

5      A.   Okay.  I didn't know.  You said about the

6    camera.

7           MR. GREEN:  She wanted you to put your hands

8    down.

9      A.   No, I know.  But she said she didn't want my

10   soda in front of me either.

11     Q.   (BY MR. WOLSON)  She just doesn't want you

12   showing your Pepsi.

13          MR. SANDBERG:  Now put your hands down.

14   There we go.  In front and not up.

15     Q.   (BY MR. WOLSON)  Have you had occasion to

16   engage the law firm of Sandberg Phoenix as counsel?

17     A.   Yes.

18     Q.   When did you first begin using that firm?

19     A.   I don't recall the general date.

20     Q.   Is it more than five years ago?

21     A.   It could be five, could be six, could --

22   five, six, seven.

23     Q.   Could it be more than ten years ago?

24     A.   I don't believe so.

25     Q.   Who at the firm did you first hire?

1      **A.    Bhavik Patel.**

2      Q.    And what was your first -- what was the

3  first matter that brought you to him?

4      **A.    Estate planning.**

5      Q.    And is Mr. Patel your primary point of

6  contact at the firm?

7      **A.    He is my primary contact at the firm, yes,**

8  **sir.**

9      Q.    Since that first engagement, have there been

10  other matters in which you've engaged Sandberg Phoenix?

11      **A.    Yes.**

12      Q.    What types of matters?

13      **A.    Sales tax matters, class action matters,**

14  **estate matters in every one of the LLCs and how they**

15  **interrelate.**

16      Q.    Anything else?

17      **A.    No.**

18      Q.    What types of class action matters have you

19  engaged Sandberg Phoenix for?

20      **A.    Class action in Madison County.**

21      Q.    In which you're a party?

22      **A.    Yes.**

23      Q.    As a plaintiff or a defendant?

24      **A.    Defendant.**

25      Q.    Is it a single case?

1       A.   Excuse me?

2       Q.   Is it a single case?

3       A.   It hasn't been certified, and I'm not sure

4  what it is right now.  It's three different lawyers

5  suing.

6       Q.   Are there three different cases?

7       A.   I don't quite understand where it is in the

8  world right now.

9            MR. WOLSON:  Can we go off the record for

10  one second?

11           THE VIDEOGRAPHER:  The time is approximately

12  1:48 p.m.  We're off the record.

13                (Break was taken.)

14                (Exhibit 81 marked for identification.)

15           THE VIDEOGRAPHER:  Going back on the record,

16  the time on the monitor is approximately 1:50 p.m.

17  Please proceed.

18       Q.   (BY MR. WOLSON)  You've been handed Exhibit

19  81.  Take a look at it and let me know once you've had

20  a chance to review it.

21       A.   Okay.

22       Q.   For the record, this is a document with a

23  Bates Number JC25778.  That's the number in the bottom

24  right-hand corner, Mr. Rochman, and this is a document

25  that we received from Sandberg Phoenix summarizing fees

1    that were billed and paid on your matters over the past

2    five years.  So let -- let me just start at the bottom

3    line, which is the total, and ask whether you know

4    whether those numbers are accurate as to the amount of

5    fees that you have incurred with Sandberg Phoenix over

6    the last five years.

7         **A.**    **I never seen the grand total before.**

8         Q.    Do you have any reason to doubt that that's

9    accurate?

10         **A.**    **I have no reason to doubt that that's**

11   **accurate.**

12         Q.    Okay.  The -- the first line references

13   Sabre Group, LLC; do you see that?

14         **A.**    **Yes, sir.**

15         Q.    And is that the entity that we talked about

16   earlier Sabre Group that has participated in or may

17   have participated in tax sales in Indiana?

18         **A.**    **It may have participated in Indiana.**

19         Q.    Okay.  And then there's a line item for

20   personal matters.  Have there been any matter --

21   personal matters other than estate planning that -- for

22   which you've engaged Sandberg Phoenix?

23         **A.**    **Not that I recall.  Wait, Barrett Rochman**

24   **the class action in Madison County.**

25         Q.    Okay.  Let me -- if you look down to the

1    three lines right before grand total, there are three

2    what appear to be litigation matters.  Do you recognize

3    those type -- those captions?

4         **A.    Lindow, Straeter, and Bueker?**

5         Q.    Yes.

6         **A.    Yes.**

7         Q.    Are those the matters you were referring to?

8         **A.    Yes.**

9         Q.    Okay.  So -- and are you named as a

10   defendant personally in those cases?

11        **A.    I believe in one of the cases I'm named**

12   **personally.**

13        Q.    And is one or more of the entities that you

14   control named in -- in any of the cases?

15        **A.    I don't control.  I have a joint.**

16        Q.    You're -- I'm sorry.  Are there any entities

17   over which you have -- in which you have an ownership

18   interest that are named as defendants in any of those

19   cases?

20        **A.    Sabre Group and SI Securities.**

21        Q.    Okay.  Is Mr. Decker named as a defendant in

22   any of those cases?

23        **A.    No.**

24        Q.    Okay.  So then going back up to the line

25   item that says Rochman, Barrett and Marilyn personal,

```
 1   other than the litigation matters and estate planning,
 2   is there anything else for which you can recall having
 3   engaged Sandberg Phoenix in a personal capacity?
 4        A.   Obviously there's some others here, but I
 5   don't recall Rochman Rentals property matters, Blue Sky
 6   Vineyards.
 7        Q.   Well, I'm sorry.  Let me just stop you.  I'm
 8   asking specifically are there other matters for which
 9   you can recall engaging them personally.
10        A.   Oh, personally?
11        Q.   Yes.
12        A.   No.
13        Q.   Okay.  All right.  We talked about SI
14   Securities earlier as one of the entities that may have
15   participated in tax sales in Indiana; right?
16        A.   Yes, sir.
17        Q.   Okay.  What is Rochman Rentals, LLC?
18        A.   It owns rental properties in Illinois.
19        Q.   Okay.  Has it ever participated in tax sales
20   in Indiana?
21        A.   No.
22        Q.   Okay.  What's Rochman Group, LLC?
23        A.   It's a tax purchasing company.
24        Q.   Has it ever participated in tax sales in
25   Indiana?
```

1        A.    **Not that I recall.**

2        Q.    Where does it purchase tax --

3        A.    **In Illinois.**

4        Q.    To your recollection, it's limited to

5    Illinois?

6        A.    **To my recollection.**

7        Q.    Okay.  Who owns Rochman Group, LLC?

8        A.    **Without having the chart and graphed in**

9    **front of me I don't know.**

10       Q.    Do you know if you have an ownership

11   interest?

12       A.    **Whereas it seems I should know that, no,**

13   **without the chart in front of me I don't know.**

14       Q.    Do you know if your son Jessie has an

15   ownership interest?

16       A.    **Without the chart in front of me I don't**

17   **know.**

18       Q.    Okay.  What is Castle Farms, III, LLC?

19       A.    **It was an entity that bought real estate in**

20   **Illinois.**

21       Q.    Did it ever participate in tax sales?

22       A.    **Yes, sir.**

23       Q.    In Indiana?

24       A.    **No, sir.**

25       Q.    Only in Illinois?

1        A.    Yes, sir.

2        Q.    And you said was.  Does it exist anymore?

3        A.    **Again, without the chart in front of me I**

4   **would not know.**

5        Q.    Do you know if you had an ownership interest

6   in it at any time?

7        A.    **Because of the estate planning without the**

8   **chart, again, I will not know.**

9        Q.    Okay.  Do you know if your son Jessie had an

10  ownership interest in it at any time?

11       A.    **Without the chart in front of me I don't**

12  **know.**

13       Q.    Was its participation in tax sales in

14  Illinois limited to any particular part of the state?

15       A.    **On a very, very, very rare occasion might be**

16  **a county or two in southern Illinois.**

17       Q.    Okay.  How about Rochman Group, was its

18  participation in tax sales ever limited to any

19  particular part of Illinois?

20       A.    **Again, a few counties in deep southern**

21  **Illinois.**

22       Q.    Okay.  What's Castle Farms, IV, LLC?

23       A.    **It's a property acquisition company.**

24       Q.    Does it participate in tax sales at all?

25       A.    **On a very, very limited bases.  We're**

1    talking in the last five years one or two times.

2          Q.    Where?

3          A.    Counties in deep southern Illinois.

4          Q.    What is Blue Sky Vineyard, LLC?

5          A.    That is a winery.

6          Q.    Let me go back.  Castle Farms, IV, LLC who

7    owns that entity?

8          A.    Without the chart in front of me I wouldn't

9    -- would not know.

10         Q.    Do you know if you have an ownership

11   interest?

12         A.    Again, without the chart in front of me I

13   don't know.

14         Q.    Do you know if your son Jessie has an

15   ownership interest?

16         A.    Blue Sky Vineyards?

17         Q.    No, I'm sorry.  Castle Farms, IV.

18         A.    Without the chart in front of me I do not

19   know.

20         Q.    Has Blue Sky Vineyards ever participated in

21   a tax sale auction?

22         A.    I believe it's possible once.

23         Q.    And --

24         A.    It may have never happened.

25         Q.    Why do you think it might have -- it might

1    have participated?

2         A.    At a certain period of time we had brought

3    as many as 14 or 15 buyers to a sale.  I think that was

4    our max.  We probably took every LLC we had.

5         Q.    Who owns Blue Sky Vineyards?

6         A.    Currently?

7         Q.    Yes.

8         A.    My wife and Jim Yewers.

9         Q.    And who?

10        A.    And Jim Yewers.

11        Q.    Have you had an ownership interest in it at

12   any time?

13        A.    Yes.

14        Q.    When?

15        A.    2005 to maybe last year, maybe early this

16   year.

17        Q.    And when do you think it might have

18   participated in a tax sale auction?

19        A.    I have no idea.  It's only a possibility.

20        Q.    Do you know where it would have

21   participated?

22        A.    Not in the least.

23        Q.    What is SI Securities Management, Inc.?

24        A.    It was a Chicago entity, and -- well, now

25   I'm not sure now.  Without the chart in front of me I

1  do not know.

2          Q.    Do you know what it did?

3          A.    It -- now I'm going to call for speculation.

4          Q.    Give me your best recollection -- give me

5    the best recollection as to what you recall it doing.

6          A.    It managed various entities that were in the

7    tax purchasing business.

8          Q.    Did it ever participate itself in tax sale

9    auctions?

10         A.    I don't believe so.

11         Q.    Who owned the shares of SI Securities

12   Management?

13         A.    Without the chart in front of me I would not

14   know.

15         Q.    Do you know if you had an ownership interest

16   in that entity?

17         A.    I don't without the chart in front of me.

18         Q.    Did your son Jessie have an ownership

19   interest in it?

20         A.    No.

21         Q.    How many entities did it manage?

22         A.    Again, without the chart I do not know.

23         Q.    Did it manage any entities that participated

24   in tax sales in Indiana?

25         A.    I don't believe so.

1      Q.    Did they participate in Illinois?

2      **A.    I don't believe -- the management company?**

3      Q.    No.  I'm asking whether it managed entities

4   that participated in tax sales in Illinois.

5      **A.    I believe it did.**

6      Q.    Okay.  And just to make sure there's no

7   misunderstanding, did the entities that it managed

8   participate in tax sales in Indiana?

9      **A.    No.**

10     Q.    What is Boo Noz Corporation?

11     **A.    It was a property holding company in Cook**

12  **County and some of the suburban counties.**

13     Q.    Did it participate in tax sale auctions?

14     **A.    It's possible, but some of these -- it may**

15  **not have even happened.  Some of these are the**

16  **possibility is there that they may have participated.**

17  **Blue Sky Vineyards it's a possibility.  There's several**

18  **that you mentioned.  It's a possibility just as much**

19  **they may have been there.  They may have not been**

20  **there.  If it happened, it happened so infrequently**

21  **it's almost impossible to recall.**

22     Q.    Who are the owners of Boo Noz Corporation?

23     **A.    Without the chart in front of me I do not**

24  **know.**

25     Q.    There's two lines down from Boo Noz is

```
1    Phoenix Bond and Indemnity Company, et al. versus John

2    Bridge.

3         A.    Bridge.

4         Q.    What is that matter?

5         A.    That was a class action lawsuit in Chicago.

6         Q.    Were you a defendant in that case?

7         A.    Yes.

8         Q.    In your personal capacity?

9         A.    I'm not sure how it was captioned.  I was an

10   et al.

11        Q.    Do you know if there were any entities in

12   which you had an ownership interest that were

13   defendants in that case?

14        A.    I don't recall.

15        Q.    Were any of your family members defendants

16   in that case?

17        A.    Yes.

18        Q.    Who?

19        A.    My wife, Jessie, Chris.  These are Chris and

20   Jessie my sons, my daughter Cory.

21        Q.    Anyone else?

22        A.    Not that I recall.

23        Q.    Is that case still pending?

24        A.    No.

25        Q.    What was the outcome?
```

1     **A.**    **Settled it.**

2     Q.    Did you engage Sandberg Phoenix to represent

3  all the members of your family in that case?

4     **A.**    **No.**

5     Q.    Who did you engage them to represent?

6     **A.**    **Okay.  I should be able to remember the**

7  **attorneys.  Harold Moskowitz and -- he billed it awful**

8  **high.  I should be able to remember.  I am drawing a**

9  **blank.  Again, you could --**

10    Q.    Do you know who Phoenix -- I'm sorry, do you

11  know who Sandberg Phoenix represented in that case

12  amongst your family?

13    **A.**    **I think they generally because of the estate**

14  **were representing me.**

15    Q.    Okay.  Were they representing any other

16  members of your family to your recollection?

17    **A.**    **Not that I -- no, not that I recall.**

18    Q.    What is -- well, we talked about SIPI, LLC;

19  right?

20    **A.**    **Yes.**

21    Q.    Who -- what is Minkis, Inc.?

22    **A.**    **I haven't got a clue.**

23    Q.    Okay.

24    **A.**    **I don't know what that is.  I have --**

25  **unless -- I have no idea.  I will be asking that**

1   question later.

2        Q.   What -- what is Sabre ISC, LLC?

3        A.   Sabre ISC obviously on the price of billing

4   not very much.  I don't recall.

5        Q.   And do you know what the Kyndberg matter is?

6        A.   I believe it's when I was negotiating with

7   Mr. Gupta or -- Mr. Gupta over some coal rights.

8        Q.   And when was that?

9        A.   I don't recall.  It may have not been

10  Mr. Gupta over coal rights.  It may have been about

11  coal rights in general.  I'm sorry, let me re --

12  rephrase that.  I believe it was other coal rights that

13  Ms. Kyndberg had an interest in, and we settled that

14  interest.  When we were cleaning up the estate, there

15  seemed to be -- her name was mentioned.  We had to

16  clear it up.

17       Q.   Are you familiar with an entity called Roil,

18  LLC, R-O-I-L?

19       A.   Yes.

20       Q.   What is that entity?

21       A.   It's a tax research company.  It's a tax --

22  they do not go to tax sales.  They buy taxes.

23       Q.   What do you mean they buy taxes?

24       A.   I'm sorry, they buy interest in oil from

25  people that may have had their taxes sold.

1      Q.    Okay.  And are you an owner of that entity?

2      A.    I think my wife is.  I am not sure, again,

3  without the chart.

4      Q.    Are you familiar with an entity called Bank

5  Homewood, LLC?

6      A.    Yes.

7      Q.    What is that entity?

8      A.    That is another -- it's a holding company

9  for property.

10     Q.    Are you an owner of that entity?

11     A.    I believe Chuck Decker and myself are both

12 owners of that company.

13     Q.    And has it participated in tax sales at any

14 point?

15     A.    If it did, it was in a very, very limited

16 basis.

17     Q.    Does Bank Homewood have any subsidiaries?

18     A.    No.

19     Q.    Your son Jessie works for Sandberg Phoenix;

20 right?

21     A.    Yes.

22           MR. ARTHUR:  Excuse me, Josh, can we get a

23 break?

24           MR. WOLSON:  Sure.

25           THE VIDEOGRAPHER:  The time is approximately

```
 1    2:07 p.m.  We're off the record.
 2                   (Break was taken.)
 3            THE VIDEOGRAPHER:  We're going back on the
 4    record.  The time on the monitor is approximately 2:13
 5    p.m.  Please continue.
 6            Q.   (BY MR. WOLSON)  Do you know when your son
 7    Jessie was hired by Sandberg Phoenix?
 8            A.   Not exactly, no.
 9            Q.   Do you know if it was before or after you
10    began using the firm?
11            A.   Before I used the firm.
12            Q.   Let me show you Exhibit 82.
13                   (Exhibit 82 marked for identification.)
14            MR. GREEN:  Before you offer this exhibit,
15    you are willing to agree to a protective order on the
16    specific nature of this document and how it's going to
17    be used?
18            MR. WOLSON:  There's a general protective
19    order in place in the case, so you can -- you have the
20    opportunity to designate the transcript, and actually,
21    for purposes of this one, I just want to --
22            Q.   (BY MR. WOLSON)  Do you recognize this as an
23    invoice from Sandberg Phoenix?
24            A.   It looks like one of their bills.
25            Q.   Okay.  And you see the -- the work performed
```

1   on this invoice is September of 2007?

2        A.   Yes.

3        Q.   Does that indicate to you that you engaged

4   them at least on some matters by September, 2007?

5        A.   **This would seem to indicate that.**

6        Q.   Okay.  Did you have any role in your son

7   Jessie being hired at Sandberg Phoenix?

8        A.   **No.**

9        Q.   Do you know what the circumstances were that

10  led him to be hired there?

11       A.   **Recollection circumstances, he started as**

12  **a -- they hire college -- they -- he started as an**

13  **intern, intern one.  Then he went to intern two the**

14  **second year, and then they liked him enough to hire him**

15  **as an associate in year three.**

16       Q.   And when he was an intern one, had you

17  started using the firm yet?

18       A.   **I don't recall.**

19       Q.   Have you discussed with anyone from Sandberg

20  Phoenix litigation about title and notify costs at --

21  for tax sales in Indiana?

22       A.   **Generalistically, yes.**

23       Q.   What do you mean generalistically?

24       A.   **With Mr. Patel.**

25       Q.   What have you discussed with him?

1           MR. GREEN:  Well, can you rephrase your

2    question a little bit more fine?  Are you asking the

3    subject matter of their conversation, or are you asking

4    for the substance?

5           Q.    (BY MR. WOLSON)  Let me ask this.  Did you

6    ever engage Sandberg Phoenix to work on any matters

7    relating to litigation about title and notify costs in

8    Indiana?

9           **A.    I believe I asked the quest -- are we not**

10   **going to get into legal?**

11          MR. GREEN:  Answer his question only.  Don't

12   tell him --

13          **A.    Okay.**

14          MR. GREEN:  -- what you talked about.

15   That's not what he asked you.

16          **A.    Okay.  Yeah.**

17          MR. SANDBERG:  You want it repeated?

18          **A.    Please.**

19          MR. WOLSON:  Can we read it back?

20              (At this time the last question was read

21              back by the reporter as follows:  "Did

22              you ever engage Sandberg Phoenix to work

23              on any matters relating to litigation

24              about title and notify costs in

25              Indiana?")

1/10/2014  BARRETT ROCHMAN

```
 1        A.    I am not sure they were engaged.  I may have
 2   had a conversation with an attorney from Sandberg
 3   Phoenix.
 4        Q.    (BY MR. WOLSON)  Was it about a matter in
 5   which you were a party?
 6        A.    Yes.
 7        Q.    Have you been a party to any litigation
 8   about title and notify costs in Indiana?
 9        A.    Have I been a party?
10        Q.    Yes.  To litigation about that subject.
11        A.    In regards, please?  I'm confused by your
12   question.
13        Q.    Have you ever been a party to litigation
14   about title and notify costs in Indiana?
15        A.    If my appearance here today makes me a
16   party, then yes.
17        Q.    Okay.  Any other occasion other than this
18   deposition?
19        A.    I was at depositions for William Groom.
20        Q.    Any other occasions?
21        A.    No, sir.
22        Q.    And were you one of the named parties to the
23   case that William -- where you appeared as a witness in
24   the William Groom matter?
25             MR. SANDBERG:  I'm not sure your -- I'm
```

1    going to object --

2        Q.   (BY MR. WOLSON)  Let me ask.  Were you --

3    were you a plaintiff?  Were you suing in that case?

4        **A.   No.**

5        Q.   Were you a defendant in that case?

6        **A.   No.**

7        Q.   Okay.  Have you discussed this litigation

8    with anyone from Sandberg Phoenix?

9        **A.   This particular litigation?**

10       Q.   Yes.

11       **A.   Yes.**

12       Q.   Who did you talk to?

13       **A.   Bhavik Patel.**

14       Q.   What did you discuss with him?

15           MR. GREEN:  Well, again, can you refine your

16   question?

17           MR. WOLSON:  No.  I don't see how that can

18   be privileged.

19           MR. GREEN:  It -- yes, it can be.  You want

20   to know the subject matter.  That's a different

21   question than the substance of the conversation.

22           MR. WOLSON:  It's -- he talked about a case

23   in which he's not a party in which Sandberg Phoenix is

24   counsel.

25           MR. GREEN:  Conversations to his attorney

1      and advice that he may see is privileged.  It doesn't

2      matter whether or not they're involved in litigation in

3      order for it to be privileged.

4                  MR. WOLSON:  I understand that.

5                  MR. GREEN:  Okay.

6          Q.   (BY MR. WOLSON)  Have you received legal

7      advice from Sandberg Phoenix about this litigation?

8          **A.   Not that I know of.**

9          Q.   Okay.  So then what did you discuss with

10     Mr. Patel about this litigation?

11                 MR. GREEN:  Again, same -- I'm going to

12     object now.  You cannot ask him about conversations

13     he's had with his attorney.  You can ask about the

14     subject matter -- I understand that -- but not the

15     substance of the communication.

16                 MR. WOLSON:  Unless the communication was

17     legal advice, it's not privileged.

18                 MR. GREEN:  And discussions with his

19     attorney outside of sports matters and stuff like that

20     is.  He sought him for legal advice.  That's the

21     question you asked.

22                 MR. WOLSON:  I just asked him whether he got

23     legal advice, and he said no.

24                 MR. GREEN:  No.  You asked him with respect

25     to litigation in Indiana in which he was a defendant.

1          MR. WOLSON:  And he earlier testified --

2          MR. SANDBERG:  Restate -- restate the full

3     question so we don't have this argument about what the

4     question was.

5          Q.   (BY MR. WOLSON)  Have you discussed this

6     case with Mr. Patel?

7          **A.   Yes.**

8          Q.   Okay.  Have you received legal advice from

9     Sandberg Phoenix about this case?

10         **A.   No.**

11         Q.   So what did you discuss with Mr. Patel?

12         **A.   Maybe yes.**

13         MR. GREEN:  Can we go off the record a

14     second?  Let me talk to him.

15         MR. SANDBERG:  Let me suggest that counsel

16     go outside with the witness because the witness is

17     obviously confused.

18         MR. GREEN:  Right.

19         MR. SANDBERG:  And see if the two of them

20     can clarify the issue.

21         MR. WOLSON:  That's fine.  I just want to

22     put the caution on the record that I have no problem

23     with you consulting with counsel as to privilege

24     issues.  That's --

25         MR. GREEN:  Correct.

1          MR. WOLSON:  Beyond that, there's a question

2     pending.  That should be the only subject of

3     discussion.

4          MR. GREEN:  Right.

5          MR. WOLSON:  Okay.

6          THE VIDEOGRAPHER:  The time is approximately

7     2:22 p.m.  We're off the record.

8               (Break was taken.)

9          THE VIDEOGRAPHER:  Going back on the record,

10    the time on the monitor is approximately 2:23 p.m.

11    Please proceed.

12         MR. WOLSON:  Can we read back the question?

13              (At this time the last question was read

14              back by the reporter as follows:  "So

15              what did you discuss with Mr. Patel?")

16    A.   Are they interested in a client referral

17    regarding tax purchasing or tax delinquency in Indiana.

18    Q.   (BY MR. WOLSON)  When did that conversation

19    take place?

20    A.   Two years ago maybe.  I can't recall exactly

21    now.  It was a couple of years ago.

22    Q.   What prompted you to reach out to Mr. Patel

23    at that time?

24    A.   They had -- already were involved in a

25    similar class action case with a William Groom.

1       Q.    And who was the potential client referral?

2       A.    Biblical name Christian Crissen.

3       Q.    Josh Crissen?

4       A.    Joshua I believe.

5       Q.    And how had you gotten in contact with

6    Mr. Crissen?

7       A.    I called him.

8       Q.    Why did you call him?

9       A.    Because I thought there was a violation of

10   the 137(b) affidavit and that -- that there was a

11   violation of the 137(b) affidavit.

12      Q.    Why did you think there was a violation of

13   the 137(b) affidavit?

14      A.    With experience with Mr. Gupta, he does all

15   his own work.  You sign the 137(b), and it's very

16   strict in its signature.  It seemly said to me -- and

17   I'm a nonlawyer -- that you had to incur and pay

18   certain fees because of the nature of Indiana.  If you

19   pay those fees and you have incurred and paid those,

20   you're at a distinct disadvantage.  The playing field

21   is totally weighted against someone who doesn't pay

22   those fees and signs that affidavit.

23      Q.    How did you find Mr. Crissen?

24      A.    I had -- I'm a researcher.  I had copies

25   of -- and I'd also gone to several counties, so I kept

1   copies of the sale sheets.  In Mr. Crissen's case, I

2   pulled one of the sales sheets out, and I had gotten

3   copies -- I'm not sure -- from the county I believe.  I

4   got -- I had five or six people who had redeemed after

5   a 137(b) had been filed.  I had looked up the telephone

6   numbers and was going to see if I could attempt to see

7   if any of these people were aware of the implications

8   of the 137(b).  He was my first and only call.  I --

9   the landline actually worked.

10          Q.   When was that call?

11          A.   Couple of years ago.

12          Q.   Time of day?

13          A.   I'm going to suggest evening.

14          Q.   Do you know what day of the week it was?

15          A.   No, sir.

16          Q.   Was it a weekday?

17          A.   I'm going to suggest it was a weekday.  Can

18   I -- that'd be speculation.  I don't know.

19          Q.   So when he answered the phone, what did you

20   say to him?

21          A.   I asked him about did he have some concerns

22   about his -- the tax liens that he had been paying tax

23   I think or two.  I looked and he had two.  Did he feel

24   that they were -- how did he feel about them.

25          Q.   And what did he say?

1          A.    He said why are you calling at this

2    particular point right now, and I said this was the

3    time I'm calling.  He said we just got through praying

4    to Jesus over this matter, which was the strangest

5    answer.  That's why I recall it.  We were just -- my

6    wife and I were at the kitchen table praying what we're

7    going to do to keep the farm and if this keeps

8    happening how we're going to keep the farm if we have

9    to make these payments like this.

10         Q.    And what did you say in response to that?

11         A.    I said, well, maybe your prayers may be

12    answered that there's -- you may be able to recover

13    some of the money you've paid.

14         Q.    Did you tell him how much?

15         A.    No.  I didn't know how much.

16         Q.    Were there any issues other than the title

17    and notify costs on the 137(b) that you thought

18    warranted a call to him?

19         A.    No.

20         Q.    So what did he say when you told him that he

21    might be able to recover some of the money?

22         A.    He was extremely interested.

23         Q.    And so what was your -- when he -- how did

24    he express his interest?

25         A.    I'm very interested.

1      Q.   And what did you say?

2      A.   There's a possibility that there are some

3 firms that might try to recover these costs for you.

4      Q.   And what was his response?

5      A.   Again, very interested how is that -- does

6 that work?  How does that happen?

7      Q.   And so what did you tell him?

8      A.   I said there are firms that do this because

9 you are like many other people who look at this as a

10 potential class action suit.

11      Q.   So what did he say when you raised the

12 possibility of a class action suit?

13      A.   It does -- does it cost me anything?  I said

14 I don't believe it does.  He wanted to make sure this

15 wasn't a scam call.

16      Q.   And so what did you say to -- what did you

17 say then?

18      A.   I said if you want -- I can't guarantee

19 anything, but I can make a call to one attorney I know.

20 And I'm willing to make that call.  He goes why are you

21 willing to do this, and then I explained to him the

22 level playing field, that I'm a tax buyer and that put

23 me at a distinct advantage because these are fees I had

24 to pay and then if you come back later to recover and

25 self-redeem if you don't incur those fees you haven't

1  incurred that loss.  So my competitors who sign 137(b)s

2  without incurring these fees are dramatically -- have a

3  dramatic advantage over the people who have to incur

4  the fee because that's money you cannot recover on a

5  self-redemption.

6      Q.  And what was his response?

7      A.  He wanted -- that he understood why I would

8  make that call then.

9      Q.  Okay.  So what did you tell him about making

10  the call?

11      A.  I would attempt to make a call, couldn't

12  promise him anything, but I could attempt to make the

13  call.

14      Q.  All right.  Why don't we switch -- hold on

15  and switch tapes.

16          THE VIDEOGRAPHER:  This marks the end of

17  tape number one in the video deposition of Barrett

18  Rochman.  We're going off the record.  The time on the

19  monitor is approximately 2:32 p.m.

20          (Break was taken.)

21          THE VIDEOGRAPHER:  We're back on the record.

22  Here marks the beginning of tape number two in the

23  video deposition of Barrett Rochman.  Time on the

24  monitor is approximately 2:33 p.m.  Please proceed.

25      Q.  (BY MR. WOLSON)  When you told Mr. Crissen

1  that you were willing to make that call, who did you
2  intend to call?
3      A.    Bhavik Patel.
4      Q.    And why were you going to call Mr. Patel?
5      A.    He's the attorney that I deal with at
6  Sandberg Phoenix who takes care of all my legal
7  problems.  He is the general umbrella attorney.
8      Q.    And why were you going to call Sandberg
9  Phoenix about this particular case?
10     A.    Because they were completing a case on
11  William Groom, so they had shown an interest in this
12  kind of activity.
13     Q.    So what did you tell Mr. Crissen that you
14  were going to do?
15     A.    Call a firm and see if they would be
16  interested in doing this again.
17     Q.    And -- and so how did you leave it with
18  Mr. Crissen?
19     A.    No guarantees.
20     Q.    Were you going to get back to him about the
21  response?
22     A.    I said I would make the call, and regardless
23  of whether they were interested or not, I would call
24  him back.
25     Q.    Did you call him back?

1        A.   Yes.

2        Q.   How long after the first call?

3        A.   It may have been later that evening.  It may

4   have been the next day, you know.  You know what I'm

5   not sure.  It could've been three days later.

6        Q.   And you spoke to Mr. Patel in the interim;

7   is that right?

8        A.   Yes.

9        Q.   And the first call you had -- the first call

10  you had with Mr. Crissen how long did that last?

11       A.   Ten to 15 minutes.  That's speculation, I'm

12  sorry.  I don't -- I don't know.

13       Q.   Prior to your call with Mr. Crissen, had you

14  told anyone at Sandberg Phoenix that you were going to

15  talk to potential plaintiffs in Indiana?

16       A.   No.

17       Q.   Had you told them you were researching

18  people who had redeemed property that had been

19  purchased by Mr. Gupta?

20       A.   Yes.

21       Q.   Who had you told?

22       A.   My -- people in my office just

23  generalistically.

24       Q.   I'm sorry.  Maybe I wasn't clear.  I asked

25  if you had told that to Sandberg Phoenix.

1        A.    I don't believe I did.

2        Q.    When you called Mr. Patel and asked if

3   Sandberg Phoenix was interested, what was his response?

4        A.    Several ad -- admonitions; several caveats.

5        Q.    What were the caveats?

6        A.    Generalistically they're interested with

7   specifics, meaning he would not call Mr. --

8        Q.    Crissen?

9        A.    -- Crissen.  Mr. Crissen would have to call

10  him.  They -- it would have to be up to them whether

11  they decide to take the case up to the facts as they

12  would see them, and I was not to guarantee or indicate

13  that -- all I could say to Mr. Crissen is that he could

14  make a call to an attorney who would listen to his

15  story.

16       Q.    And so when you called Mr. Crissen back,

17  tell me about that conversation.

18       A.    I called him back and indicated that there

19  is an attorney.  I gave him the number.  I gave him his

20  name.  Again, I told Mr. Crissen that there -- with

21  admonitions there was no guarantees.  They were working

22  or had been working on a case similar to this.  They

23  indicated that they would listen to your story.  It's

24  between you and them to decide how this sorts itself

25  out, but there would be someone who would listen to

```
1    you.
2           Q.    And what did he say?
3           A.    Thank Jesus.
4           Q.    Anything else?
5           A.    He thought I walked on water.  It was the
6    most amazing -- well, it doesn't matter.  It was more
7    religious than I have ever -- it was the most strange
8    response.  He thought I was something out of Heaven
9    sent, but I kept telling him there's no guarantees,
10   please understand that.  These are just -- this is just
11   fortuitous maybe at best.
12          Q.    After you spoke to Mr. Crissen, did you
13   contact any of the other people who had redeemed
14   properties --
15          A.    No.
16          Q.    -- that you had identified?
17          A.    No.
18          Q.    Why not?
19          A.    He was going to call them.  If this wasn't a
20   good enough case, I doubt if anybody else I would
21   recommend would be any better.
22          Q.    Did you learn at some point that Mr. Crissen
23   had retained -- had retained Sandberg Phoenix?
24          A.    I think several months two, three, four
25   months later just heard it, overheard it.
```

1      Q.    From whom did you overhear it?

2      A.   I don't recall, but I got the impression

3  that they were involved.  I think I may have asked the

4  question to somebody in the firm.  I'm not sure, and I

5  think I got that as a generalistic answer.

6      Q.    Why did you ask someone in the firm?

7      A.   Because I was curious.  Months had gone by,

8  weeks had gone by, something had gone by.

9      Q.    Had you spoken with Mr. Crissen since then?

10     A.   No.

11     Q.    Since you learned that Mr. Crissen had

12  retained Sandberg Phoenix, have you spoken to anyone

13  from Sandberg Phoenix about this litigation?

14     A.   Attempted to talk about it.

15     Q.    Who did you attempt to talk about it with?

16     A.   Attempt to talk to Jessie.  Talk about a

17  Chinese fire wall.  I could talk about anything.  He

18  would talk about cases -- I love talking to my son

19  about the law.  He would talk about cases in general

20  that he was working on.  We would share that, talk

21  about that.  I was proud of him being an attorney.  If

22  I brought this case up, his eyes -- eyes would almost

23  glaze over, and he just went on to another subject.

24     Q.    What specifically did you ask your son about

25  this case?

1      A.   I don't recall.  I asked how it was going,

2   what's happening.  I think the only advice he gave to

3   me was Chuck Pacer.

4      Q.   Did you speak to Mr. Patel at all about this

5   case?

6      A.   Attempted that too, and he said it just

7   isn't really something he should talk about.  Oh, I'm

8   sorry, keep my hands down.  Okay.

9      Q.   Do you know if your wife has spoken to your

10  son about this case?

11     A.   Oh, no.

12     Q.   Do you know if Mr. Decker has spoken to your

13  son about this case?

14     A.   No.  Mr. Decker is a very passive investor.

15     Q.   You mentioned the Groom case that Sandberg

16  Phoenix handled.  Was Mr. Groom a competitor of yours

17  with respect to Indiana tax sales?

18     A.   Yes.

19     Q.   And what do you know about that case?

20     A.   It settled.

21     Q.   Did you have any involvement with it?

22     A.   I was deposed two and a half times.

23     Q.   Any other involvement?

24     A.   No.

25     Q.   Did you discuss that case with anyone from

```
 1    Sandberg Phoenix during the course of that case?
 2         A.    There was general conversation how the
 3    law -- how Indiana worked.
 4         Q.    Who did you have that general conversation
 5    with?
 6         A.    Bhavik Patel, I believe.  You know what, I'm
 7    not sure.
 8         Q.    Did you discuss that litigation with anyone
 9    from Sandberg Phoenix prior to it being filed?
10         A.    Yes.
11         Q.    Who did you talk to?
12         A.    Bhavik Patel.
13         Q.    And was that the conversation we were just
14    discussing?
15         A.    Prior -- Joshua's case?
16         Q.    No.   Prior to the Groom case being filed --
17         A.    Yes.  Go on.
18         Q.    -- did you speak to Mr. Patel about the
19    Groom case prior to it being filed?
20         A.    Well, it wasn't the Groom case.  It was more
21    about the situation in Indiana on the 137(b).  It
22    became the Groom case.
23         Q.    Did you have any involvement with
24    identifying potential plaintiffs for the Groom case?
25         A.    Yes.
```

1          Q.    What was your involvement?

2          A.    I contacted -- I think I tried to make five

3    calls, succeeded on two and from which point someone

4    called again with admonitions.  When I called

5    Mr. Patel -- they contacted Mr. Patel -- somebody

6    contacted Mr. Patel.  I didn't even -- when it was all

7    said and done, I didn't even know who the people were.

8    When the case happened, I didn't even know who

9    Mr. Bowen was.  I wouldn't remember him.

10         Q.    So let me just make sure I understand.  You

11   tried to contact five or six people about potentially

12   being plaintiffs against Mr. Groom; is that right?

13         A.    Yes.  I only succeeded in three, two maybe.

14         Q.    And -- okay.  So you succeeded in getting in

15   contact with two or three people?

16         A.    Yes.

17         Q.    And what was -- they were all -- were they

18   all interested in being potential -- potentially being

19   plaintiffs?

20         A.    They seemed to be.

21         Q.    And did you tell -- what did you tell them

22   about possibly being plaintiffs?

23         A.    I left the telephone number that they had to

24   make the call.

25         Q.    And whose telephone number did you leave?

1          A.    Mr. Patel's.

2          Q.    Had you told Mr. Patel you were doing that

3     prior to doing it?

4          A.    I asked if I could do that.

5          Q.    And what did he tell you?

6          A.    I believe again with promise nothing.

7     You're doing it -- if you're doing it, we'll listen,

8     but promise -- there are no promises.  There's no

9     guarantees.  They asked me about the Indiana situation

10    as I saw it.  They would want to hear from a potential

11    plaintiff and ask them those questions.

12         Q.    Did you discuss with Mr. Patel whether or

13    not your son would work on those litigation matters?

14         A.    No.

15         Q.    Have you contacted potential plaintiffs to

16    sue any other competitors about Indiana tax sales?

17         A.    Oh, no.  That's come to a dead end.

18         Q.    Why has it come to a dead end?

19         A.    Two and a half depositions of Groom and this

20    deposition today, I don't need this grief.

21         Q.    Have you paid Sandberg Phoenix any legal

22    fees in connection with this litigation?

23         A.    Just recently they had to review this

24    litigation because of this deposition because of the

25    class action in Madison County, so I have paid them

1    fees as it relates to the class action there.  They

2    have to know what's happening here.

3         Q.   Okay.  Had -- did you pay Sandberg Phoenix

4    any legal fees in connection with the Groom case?

5         A.   No, I don't believe so.  If you -- if it's

6    on the bill, you've got the bills, and you saw them.

7    If it's there, it's there.  The reason you don't have

8    this most recent -- the bill that we're talking about

9    came in after about a week or ten days after I shipped

10   you everything, so it would be on the most current

11   bill.

12        Q.   And forgive me if I asked this earlier.

13   Have you been -- have you paid Sandberg Phoenix any

14   legal fees with respect to any cases in which you're a

15   party in Indiana -- or, I'm sorry, let me start over.

16             Have you paid Sandberg Phoenix any legal

17   fees in connection with any case in which you're a

18   party relating to title or notify costs in Indiana?

19             MR. SANDBERG:  Let me -- let me object.  You

20   haven't established first of all that there are any

21   such cases involving him.  I think that's -- before you

22   get to have you paid any fees, you got to -- it's got

23   to be established that there's a case.

24             MR. GREEN:  Early in the deposition --

25             MR. SANDBERG:  And you did that.

1          MR. GREEN:  -- he did ask that question.

2          MR. SANDBERG:  Yeah.  You asked that earlier

3     in the deposition, and he said there was no such case.

4          MR. WOLSON:  Let's just let him answer the

5     questions.

6          **A.    I don't recall.**

7          MR. WOLSON:  Can we mark this 83?

8               (Exhibit 83 marked for identification.)

9          **A.    Can I look at that?**

10         MR. GREEN:  Yeah, you can look at that.

11         Q.    (BY MR. WOLSON)  Yeah, please.  Please do.

12         **A.    Okay.**

13         Q.    This is a -- do you recognize this as a bill

14    from Sandberg Phoenix?

15         **A.    Yes.**

16         Q.    Dated March 4, 2010; do you see that?

17         **A.    Yes.**

18         Q.    On the first page, there's some handwriting

19    in the middle towards the top.  It looks like it says

20    Sabre Number 7867; do you see that?

21         **A.    Yes.**

22         Q.    Did I read that right?

23         **A.    It would seem like you did.**

24         Q.    Do you know whose handwriting that is?

25         **A.    No.  Bookkeeping, something from**

1    bookkeeping.

2         Q.   How many employees does Sabre Group have?

3         A.   **That work on Sabre Group issues 10 to 12.**

4         Q.   How many of them are bookkeepers?

5         A.   **Two.**

6         Q.   There's an entry on the second page dated

7    February 10, 2010; do you see that?

8         A.   **Yes.**

9         Q.   Do you understand that the initials BRP to

10   be Mr. Patel's initials?

11        A.   **Yes.**

12        Q.   Okay.  There's a reference to a conversation

13   with Mr. Hughes.  Do you know who that is?

14        A.   **I don't recall Mr. Hughes.**

15        Q.   Okay.  It says -- after the first semicolon,

16   it says, "Correspondence to Mr. Hughes regarding

17   request for certain documentations for tax sale in

18   Indiana."  Do you know what that refers to?

19        A.   **No.**

20        Q.   Do you know why Sandberg Phoenix was

21   requesting documentations for tax sales in Indiana in

22   February, 2010?

23        A.   **This would be speculation, but --**

24             MR. GREEN:  Don't speculate.

25        A.   **Okay.**

```
 1              MR. GREEN:  We talked about that.

 2        A.    Okay.  Can't speculate.

 3              MR. GREEN:  Tell him what you know.

 4        A.    I asked some questions regarding was I an

 5   injured party because of the 137(b) disparity, and he

 6   would get back to me.  He asked a few questions.

 7        Q.    (BY MR. WOLSON)  So you were contemplating

 8   litigation at that time?

 9        A.    Yes.

10        Q.    Against whom?

11        A.    Competitors who used the 137(b) document in

12   a way that created what I considered a very unlevel

13   playing field.

14        Q.    Including Mr. Gupta?

15        A.    Yes.

16              MR. WOLSON:  Let's mark this as Exhibit 84.

17                  (Exhibit 84 marked for identification.)

18              MR. WOLSON:  Oh, I'm sorry, I took one.  I

19   have one for you.

20              MR. GREEN:  Huh?

21              MR. WOLSON:  I have one for you.

22        A.    Okay.

23        Q.    (BY MR. WOLSON)  Do you recognize this as a

24   bill that you received from Sandberg Phoenix?

25        A.    Yes.
```

1        Q.    And do you see it's dated January 22, 2010?

2        A.    **Oh, yes.  Okay.**

3        Q.    And do you see on the left-hand column at

4    the time entries that -- that it's for work that was

5    performed in 2009, in December, 2009?

6        A.    **Yes.**

7        Q.    Okay.  If you go down to the -- the second

8    entry is legal research and memorandum re Indiana tax

9    statutes providing for property redemption procedures

10    and requirements?

11        A.    **Yes.**

12        Q.    Do you know what legal research was being

13    done at this time on that subject?

14        A.    **Was I an injured party.**

15        Q.    And if you go down two entries, there's an

16    entry dated December 14, 2009 with the initials JBR; do

17    you see that?

18        A.    **Yes.**

19        Q.    Is that your son Jessie?

20        A.    **Well, on the back it says J. Rochman, so it**

21    **would be J. Rochman.**

22        Q.    Okay.  And his middle initial is B?

23        A.    **This would seem to indicate same.**

24        Q.    There's -- the first entry here from the

25    first clause here says draft FOIA request.  Do you see

1    that?

2         A.    The first entry?

3         Q.    The first clause of that entry with your

4    son's initials next to it.

5         A.    JBR.  Let me check.  Yes.

6         Q.    Okay.  Do you know what the FOIA request

7    was?

8         A.    No.

9         Q.    Do you know why there was a FOIA request for

10   statement of costs paid on tax sales in Indiana at that

11   time?

12        A.    No.

13        Q.    After the word and it says, "Research

14   whether class action is suitable for same;" do you see

15   that?

16        A.    Yes.

17        Q.    What sort of class action were you

18   contemplating at that time?

19        A.    I thought I was an injured party.

20        Q.    Who was the class who you would represent?

21        A.    People in Indiana who did not -- that

22   created a 13 -- 137(B) discrepancy that put them at a

23   distinct advantage and put me at a disadvantage.

24        Q.    Those would be the defendants; right?

25   That's who you would sue, the people who put you at a

1    disadvantage in your view?

2        **A.    People who mis-signed the 137(b) to put them**

3    **at an economic advantage, yes.**

4        Q.    Do you know what the -- do you know what the

5    class of potential plaintiffs that you were considering

6    was at that time?

7        **A.    People who bid farm ground and oil ground.**

8        Q.    Other bidders you're saying?

9        **A.    Yes.**

10       Q.    The next entry also dated the 14th says,

11   "Draft model letter to local counsel;" do you see that?

12       **A.    I'm sorry, give me the date again.**

13       Q.    It's 12/14/09.  It's the -- the one

14   immediately under the one with your son's initials.

15   There's initials CFW next to it.

16       **A.    Yes.**

17       Q.    Do you know who the local counsel that --

18   was that was contemplated as?

19           MR. SANDBERG:   Look at the entry two above.

20       **A.    Let's see if CFW is on the back page here.**

21   **I don't know who CFW is.  It's not on the back either.**

22       Q.    (BY MR. WOLSON)  Well, I guess what I'm

23   asking --

24       **A.    C. Wong it looks like.  It's an associate.**

25       Q.    Right.  But there's a reference here in the

1    entry to local counsel, and as I think Mr. Sandberg was

2    pointing out, on December 11th of '09 there's a

3    reference -- the entry for December 11th of '09 there's

4    a reference to local counsel in Orange County; do you

5    see that?

6         A.   I have no idea what Orange County would have

7    to do with this.  I think it might be a totally

8    unrelated matter.

9         Q.   Okay.  Well, do you know if the entry on

10   December 14th of '09 relates to your potential

11   litigation?

12        A.   If it says Indiana, yes.  It says Orange

13   County.  I have no clue what that means.

14        Q.   Okay.  The next entry for Mr. Wong also

15   dated December 14th of '09 is 3.3 hours, and it says --

16        A.   Okay.  Mr. Wong.

17        Q.   And it says, "Draft model letter giving

18   instructions for discussions with targeted prospects;"

19   do you see that?

20        A.   Yes.

21        Q.   Who were the targeted prospects?

22        A.   I have no idea.

23        Q.   What were they prospects for?

24        A.   I don't know.

25        Q.   Did you pay this bill?

1         **A.    We pay all our bills.**

2         Q.    Did you raise any questions about any of

3    these entries before you paid them -- before you paid

4    this bill?

5         **A.    No, I didn't.**

6         Q.    Okay.  If you turn the page, there's an

7    entry -- the first entry on the second page is dated

8    December 16th of '09.  Are you with me?

9         **A.    December 16th of '09.  I don't know what**

10   **that's about.**

11        Q.    So -- so you don't know what draft reference

12   list for business prospects refers to?

13        **A.    No.**

14        Q.    On December 17th the next entry is from your

15   son.  It's JBR initials again; do you see that?

16        **A.    Uh-huh.**

17        Q.    And after the semicolon it says, "Draft

18   public access record request letters to Spencer,

19   Daviees, Pike, Gibson, and Posey County;" do you see

20   that?

21        **A.    Yes.**

22        Q.    Do you know what public access records

23   requests were being made to those counties at that

24   time?

25        **A.    No.**

1       Q.   Do you know why public access records
2  requests were being made at that time?
3       **A.   I'd have to speculate.**
4       Q.   Why don't you give me your best guess?
5       **A.   Because I requested whether was I an injured**
6  **party.  I had requested that they review that.**
7       Q.   If you go down a couple of entries, there's
8  an entry dated December 21, 2009; do you see that?
9       **A.   Yes.**
10      Q.   Also with your son's initials JBR; do you
11  see that?
12      **A.   Yes.**
13      Q.   And it says, "Draft e-mail to SRI."  Do you
14  know who SRI is?
15      **A.   That is a -- the people that handle the tax**
16  **sales in Indiana.**
17      Q.   What do you mean handle the tax sales?
18      **A.   They conduct the sales.  They -- yeah.**
19      Q.   And it references FOIA requests.  Do you
20  know what FOIA requests were being made to SRI?
21      **A.   No.**
22      MR. WOLSON:  Let me mark Exhibit-85.
23           (Exhibit 85 marked for identification.)
24      **A.   Can I look at it?**
25      Q.   (BY MR. WOLSON)  Yeah.

1              MR. GREEN:  Yes.

2         Q.   (BY MR. WOLSON)   Please do.

3         A.   **Okay.**

4         Q.   Do you recognize this as another invoice

5    from Sandberg Phoenix?

6         A.   **Yes.**

7         Q.   And by the way, when you receive invoices

8    from Sandberg Phoenix, are they maintained in the

9    ordinary course of business then?

10        A.   **They're maintained, yes.**

11        Q.   Okay.  As part of Sabre Group's business?

12        A.   **All our bills are maintained, yes.**

13        Q.   Again, there's some handwriting on the first

14   page of this.  It says Sabre Number 8865; do you see

15   that?

16        A.   **Yes.**

17        Q.   Do you know whose handwriting that is?

18        A.   **No.**

19        Q.   On the second page -- well, let me -- I'm

20   sorry, let me ask you.  Do you rec -- you see that this

21   is dated May 6, 2010?

22        A.   **Yes.**

23        Q.   And it -- if you look at the second page,

24   the billing entries begin on April 4th of 2000 -- or,

25   I'm sorry, April 1, 2010; do you see that?

1      A.    Yes.

2      Q.    So that first entry is from Mr. Patel; is

3  that right?

4      A.    **BRP if that's what the initials mean in the**

5  **back, yes.**

6      Q.    Okay.  It says, "Meet with class action

7  attorney regarding interest in potential suit;" do you

8  see that?

9      A.    **Yes.**

10      Q.    What suit?

11      A.    **The one that we're reviewing if I was an**

12  **injured party I believe.**

13      Q.    And who was the class action attorney?

14      A.    **I don't know who they were trying to meet.**

15      Q.    Had you talked to Sandberg Phoenix about

16  handling the case themselves?

17      A.    **Yes.**

18      Q.    If we can go back to Exhibit 84 for one

19  second, there was a reference I asked you a couple of

20  times about.  Well, there's a reference to targeted

21  prospects on the first page in the entry from December

22  14th of '09.  Do you remember that question?

23      A.    **Yes.**

24      Q.    If you were going to be the plaintiff, do

25  you know why there was a need to identify targeted

 1   prospects?

 2        **A.    I couldn't even begin to speculate.**

 3        Q.    Okay.  On -- on April 7th of 2010 --

 4        **A.    Which --**

 5        Q.    I'm sorry, going back to 85.

 6        **A.    Yes.**

 7        Q.    There's an entry on the second page from

 8   April 7th of 2010 from Mr. Patel, and after the

 9   semicolon on he says, "Call to outside law firm

10   regarding Indiana matter;" do you see that?

11        **A.    Yes.**

12        Q.    And is the Indiana matter the one where you

13   were going to be bringing a potential class action?

14        **A.    I would guess that's what it would be.  I'd**

15   **have to speculate it is.**

16        Q.    Okay.  Do you know who the outside law firm

17   referenced here is?

18        **A.    No.**

19        Q.    If you go to the next page, there's an entry

20   dated April 23, 2010 from Mr. Patel.

21        **A.    Uh-huh.**

22        Q.    And it says, "Call to Steven Tillery Law

23   Firm;" do you see that?

24        **A.    Yes.**

25        Q.    Do you know who the Steven Tillery Law Firm

1   is?

2        A.    Haven't got a clue.

3        Q.    It also says, "And Simmons Law Firm;" do you

4   see that?

5        A.    Yes.

6        Q.    Do you know who the Simmons Law Firm is?

7        A.    Not in Indiana.

8        Q.    Do you know any Simmons Law Firm?

9        A.    There is a law firm in Madison County called

10  Simmons, but I don't know if it's the same Simmons.

11       Q.    Do you know why Mr. Patel was speaking to

12  those law firms on April 23, 2010?

13       A.    No.  Again, I can only speculate he was

14  rounding out.

15       Q.    Did you -- well, let me -- I'm sorry, let me

16  start over.  There's an entry here for April 27, 2010

17  for Mr. Patel.  It says, "Call with Ted Generis;" do

18  you see that?

19       A.    I have no idea who Mr. Generis is.

20       Q.    Okay.  And there's also a reference to a

21  Mr. Bob Hughes.  Do you know who that is?

22       A.    We've dealt with this.  I have no idea who

23  Mr. Hughes is.

24       Q.    Okay.  You paid this bill?

25       A.    We pay every bill.

```
 1                MR. WOLSON:  Let's mark this as 86.
 2                (Exhibit 86 marked for identification.)
 3        A.   Okay.
 4        Q.   (BY MR. WOLSON)  Do you recognize this as an
 5   invoice from Sandberg Phoenix --
 6        A.   Yes.
 7        Q.   -- that you received?
 8        A.   Yes.
 9        Q.   You see it's dated July 16, 2010?
10        A.   Yes.
11        Q.   And again, there's handwriting on the first
12   page.  Do you know whose handwriting that is?
13        A.   No.
14        Q.   On the second page, there are some entries.
15   Do you see that this invoice covers work done in June,
16   2010?
17        A.   Yes.
18        Q.   And the third entry from Mr. Patel after the
19   semicolon says, "Research various issues regarding
20   class action suit;" do you see that?
21        A.   Yes.
22        Q.   Do you understand that to be the same suit
23   that you've been discussing where you were going to be
24   a potential plaintiff?
25        A.   I believe it is.
```

1/10/2014  BARRETT ROCHMAN

1    Q.    The next entry is from someone with initials

2    BAH; do you see that?

3    **A.    BAH.  Okay.**

4    Q.    Based on the last page, do you see that as a

5    B. Haltenhof, who's a paralegal?

6    **A.    I have no idea who that person is.**

7    Q.    The -- the entry references researching

8    champerty and its applicability in Indiana on a lawsuit

9    that might be brought for fraud after redemption of a

10   piece of property; do you see that?

11   **A.    Yes.**

12   Q.    Do you know what champerty is?

13   **A.    Not clear, no, sir.**

14   Q.    Do you have a general understanding of what

15   it is?

16   **A.    No.**

17   Q.    Okay.  Do you know why Sandberg Phoenix was

18   researching champerty at that point?

19   **A.    No.**

20   Q.    The next entry is from June 4th also from

21   BAH.

22   **A.    Okay.  Wait, June 4th.  Yeah.**

23   Q.    And there's a reference to -- in that entry

24   to the clean hands doctrine; do you see that?

25   **A.    Yes, sir.**

1      Q.    Do you know what that is?

2      A.    No, sir.

3      Q.    After the reference to clean hands doctrine,

4  it says, "Applies to purchase of property that is

5  subject to redemption and a lawsuit regarding that

6  redemption;" do you see that?

7      A.    Yes.

8      Q.    Were you contemplating purchasing property

9  for purposes of bringing a lawsuit at that point?

10      A.    I don't recall that.

11      Q.    Did you ever contemplate funding someone

12  else to purchase property that would be subject to a

13  lawsuit?

14      A.    No.

15      Q.    I asked you whether you had been thinking

16  about it at this time, but had you -- did you ever

17  contemplate purchasing property yourself so that you

18  could bring a lawsuit in Indiana?

19      A.    I contemplate a lot of things, but I don't

20  remember -- I don't recall that in particular.  I

21  couldn't get over the fact that I was not an injured

22  party.

23      Q.    On the next page there's an entry June 8,

24  2010.

25      A.    Uh-huh.  Wait, June, 2010 must be this one.

1    **Yes.**

2         Q.   And after the second semicolon -- I'm sorry,

3    I'm sorry.  The June 8th one says, "Review and revise

4    and update spreadsheet compiling tax sales in the state

5    of Indiana;" do you see that?

6         **A.   On the 10th?**

7         Q.   No.  June 8, 2010.

8         **A.   June 8th, I'm sorry.  Yes.**

9         Q.   Why were you -- why did you have Sandberg

10   Phoenix preparing a spreadsheet to compile tax sales in

11   the state of Indiana at that point?

12        **A.   I still thought I was an injured party.**

13        Q.   So -- so at this point were you making any

14   effort to identify other potential plaintiffs?

15        **A.   As some -- if I couldn't buy it and they**

16   **could, I wanted to know who -- after looking at the**

17   **137(b)s, I wanted to know who they were and dates and**

18   **when they bought them, how did that work because it**

19   **didn't -- we could not make money in Indiana if they**

20   **could file a false 137(b), so I was trying to work my**

21   **way out of this mess that I was in, put all this**

22   **research in and found out that we could not bid.**

23        Q.   And so you were compiling that spreadsheet

24   because you were struggling with the idea that you were

25   not an injured party.  Is that what you said?

1    **A.    I was struggling with the idea that -- yeah,**

2  **I thought I was -- I kept thinking if I said often**

3  **enough I'm an injured -- if I'm injured, I'm injured.**

4         Q.    And were you looking for other potential

5  plaintiffs to bring claims against your competitors at

6  that point?

7              MR. GREEN:  I will --

8    **A.    No.**

9              MR. GREEN:  -- object at this point.  You

10  asked that question.  He answered that question.  He'll

11  stand by his earlier answer.

12             MR. WOLSON:  Well, he can answer.  Go ahead.

13             MR. GREEN:  No.

14   **A.    Say the question again.**

15             MR. GREEN:  He will not --

16             MR. WOLSON:  Okay.  That's not a proper

17  objection, and it's certainly not a proper instruction

18  not to answer.  You can -- you can instruct him not to

19  answer on privilege grounds.  There's no other --

20             MR. SANDBERG:  He answered.  Let's move on.

21             MR. WOLSON:  Well, why doesn't he answer

22  again for my sake.

23             MR. SANDBERG:  It's twice on the record

24  already.

25             MR. WOLSON:  John, just let him answer.

1    It'll be faster.

2         MR. GREEN:  Well, just so that you know,

3    you're limited in terms of time of deposition.  If you

4    want to waste your time in this manner, that's fine.

5    He's already answered the question twice.  This is

6    going to be the third time.

7         Q.  (BY MR. WOLSON)  Go ahead.

8         **A.  Could you repeat the question, please?**

9         Q.  Why don't we have it read back.

10                  (At this time the last question was read

11                  back by the reporter as follows:  "Were

12                  you looking for other potential

13                  plaintiffs to bring claims against your

14                  competitors at this point?")

15         MR. SANDBERG:  And read the answer, please.

16         MR. WOLSON:  I don't think he answered that

17    question, John.

18         MR. SANDBERG:  He did answer that question.

19    I heard it twice.  We can play back the video.  I heard

20    him answer twice.

21         MR. WOLSON:  He didn't answer that question

22    at that moment, and I'm asking him to go ahead and

23    answer that question.

24         MR. SANDBERG:  So you have -- you have no

25    answer listed?

```
 1                    THE REPORTER:  I do but it's later.

 2                    MR. SANDBERG:  All right.

 3                    THE REPORTER:  It's after --

 4                    MR. SANDBERG:  I want --

 5                    THE REPORTER:  -- the objection.

 6                    MR. SANDBERG:  I want to -- I want to hear

 7      the answer.

 8                    THE REPORTER:  Okay.

 9          A.    No.

10                    MR. GREEN:  He means he wants to hear the --

11          A.    I'm sorry.

12                    MR. SANDBERG:  Sorry about that.  Just we'll

13      move on.

14                    MR. ARTHUR:  Let's go off the record while

15      she's checking that.

16                    MR. SANDBERG:  We'll just move on.  He's

17      answered it again.

18                    MR. ARTHUR:  I want to raise a question.

19                    THE VIDEOGRAPHER:  Are we on or off?

20                    MR. ARTHUR:  Let's go off the record.

21                    THE VIDEOGRAPHER:  Okay.  Time is

22      approximately 3:15 p.m.  We're off the record.

23                        (At this time an off-the-record

24                         discussion was held.)

25                    THE VIDEOGRAPHER:  We're going back on the
```

```
 1    record.   The time on the monitor is approximately 3:17
 2    p.m.   Please continue.
 3                    MR. WOLSON:   Let's mark this as Exhibit 86.
 4                    MR. SANDBERG:   7.
 5                    MR. WOLSON:   7.   Okay.
 6                    (Exhibit 87 marked for identification.)
 7         Q.   (BY MR. WOLSON)   Do you recognize this as a
 8    invoice you received from Sandberg Phoenix?
 9         A.   Yes.
10         Q.   You see it's dated August 16, 2010?
11         A.   Thank you.   Yes.
12         Q.   If you flip through the third page.
13         A.   Dates, please.
14         Q.   There's an entry dated 7 -- July 20, 2010
15    with the initials TEB.
16         A.   July 7th?
17         Q.   July 20th.
18         A.   July 20th, sorry.
19         Q.   The entry reads, "Conference with Bhavik
20    Patel re Indiana tax sales and potential contingency
21    case;" do you see that?
22         A.   Yes.
23         Q.   What was the potential contingency case?
24         A.   I have no idea.
25         Q.   Why were you paying Sandberg Phoenix for a
```

1    discussion of a potential contingency case?

2         A.   That's a good question.

3         Q.   You did pay this bill; right?

4         A.   Yes.

5         Q.   Okay.  Did you question this entry when you

6    paid it?

7         A.   No.

8         Q.   If you go down -- well, do -- do you know

9    which potential contingency case it was?

10        A.   No.

11        Q.   Okay.  If you go down two entries, there's

12   an entry for Mr. Patel dated July 22, 2010 where he

13   says, "Call to potential plaintiffs in class action

14   matter;" do you see that?

15        A.   Yes.

16        Q.   Do you know who the potential plaintiffs

17   Mr. Patel was calling at that point were?

18        A.   No, I don't.

19        Q.   There's also a call to local counsel.  Do

20   you see that in that same entry?

21        A.   Yes.

22        Q.   Do you know who the local counsel was?

23        A.   No.

24        Q.   And then on July 23rd the next entry there's

25   another entry that reads, "Call to multiple potential

1    plaintiffs in the Indiana matter;" do you see that?

2         A.    Yes.

3         Q.    And again, do you know who the potential

4    plaintiffs were?

5         A.    No.

6         Q.    You've participated in property tax sales in

7    Madison County, Illinois; is that right?

8         A.    Yes.

9         Q.    Was that you personally?

10        A.    Yes.

11        Q.    And was it also through a corporate entity?

12        A.    **Wait, me personally Barrett Rochman Madison**

13   **County, no.**

14        Q.    Okay.  It was corp -- it was through a

15   corporate entity?

16        A.    **LLCs.**

17        Q.    Do you know which ones?

18        A.    **Sabre Group, SI Securities.**

19        Q.    Were any of the entities in which you

20   participated in property tax sales in Madison County,

21   Illinois any of these in which your son Jessie has an

22   ownership interest?

23        A.    **No.**

24        Q.    Okay.  During the course of that

25   participation, you -- you reached an implicit agreement

1  with other bidders at Madison County tax auctions that

2  you would typically bid only the statutory maximum

3  interest rate of 18 percent and not compete to reduce

4  the interest rate when purchasing property tax liens at

5  Madison tax sale; is that right?

6        MR. GREEN:  Well, no, wait a minute.  You

7  and I discussed this.  He's going to raise the Fifth

8  Amendment with respect to the matters that would lead

9  to potential ramifications in a criminal proceeding.

10        MR. WOLSON:  Okay.

11        MR. GREEN:  And the way you asked that

12  question touches upon that concern.

13        MR. WOLSON:  Okay.  Well, let me -- let me

14  short --

15        MR. GREEN:  If you will --

16        MR. WOLSON:  Let me just short circuit that

17  if I can, and he can assert the Fifth for that

18  question.  Let me try and short circuit that.  Let's

19  mark this as Exhibit 88.

20        (Exhibit 88 marked for identification.)

21  **A.    Okay.**

22        Q.    (BY MR. WOLSON)  This is a document from a

23  matter captioned United States of America versus

24  Barrett R. Rochman, Criminal Number 3, colon, 13, dash,

25  cr, dash, 30222, dash, DRH in the United States

1    District Court for the Southern District of Illinois.

2    Have you seen this document before?

3         **A.    Yes.**

4         Q.    And if you look at the last page, Page 7,

5    under the word agreed, is that your signature?

6         **A.    Yes.**

7         Q.    Did you read this before you signed it?

8         **A.    Yes.**

9         Q.    Okay.  If you look at the bottom of Page 5

10   paragraph 18.

11            MR. GREEN:  I don't have a Page 5.

12        **A.    I don't have a Page 5 either.**

13        Q.    (BY MR. WOLSON)  Okay.

14            MR. GREEN:  May I just look at his first?

15            MR. WOLSON:  Well, he said he doesn't have

16   one either.  Why don't we --

17            MR. SANDBERG:  I don't think any of us do.

18            MR. WOLSON:  Yeah.  I assume it was a

19   copying error.  I do, so why don't we substitute this

20   one in unless anyone objects to the holes on the

21   record.  Should we -- let's go off the record for a

22   second.

23            THE VIDEOGRAPHER:  Time is approximately

24   3:25 p.m.  We're off the record.

25                 (Break was taken.)

1              THE VIDEOGRAPHER:  Going back on the record,

2      time on the monitor is approximately 3:31 p.m.  Please

3      proceed.

4          Q.    (BY MR. WOLSON)  So if we go to the bottom

5      of Page 5 --

6          A.    Yes.

7          Q.    -- of Exhibit 88 as it's been remarked

8      paragraph 18 --

9          A.    Yes.

10         Q.    -- says, "Certain tax buyers, including

11     Barrett R. Rochman, reached an implicit mutual

12     understanding that they would typically bid only the

13     statutory maximum interest rate of 18 percent and not

14     compete to reduce the interest rate when purchasing

15     property tax liens at the Madison County tax sale;" is

16     that right?

17         A.    An implicit agreement, yes.

18         Q.    And that's something to which you stipulated

19     in this document; right?

20         A.    Yes, I did.

21         Q.    And in addition, below the paragraphs of the

22     lettered A -- letters A and B.

23         A.    What page, sir?

24         Q.    Page 6 now still paragraph 18 but below A

25     and B.

1      **A.    Yes.**

2      Q.    It says, "Certain tax buyers, including

3      Barrett R. Rochman, made campaign contributions

4      solicited by Bathon so that he would continue

5      structuring the tax sale in a way that maximized the

6      interest rate applied to tax liens sold at the Madison

7      County tax sales;" right?  Did I read that right?

8      **A.    Yes, sir.**

9      Q.    And that's something that you stipulated to

10     with the federal government; right?

11     **A.    Yes, sir.**

12     Q.    And you've now pled guilty to a criminal

13     violation of the Sherman Antitrust Act; is that right?

14     **A.    Yes, sir.**

15     Q.    And you're awaiting sentencing; is that

16     right?

17     **A.    Yes, sir.**

18     Q.    I don't have anything further at this time.

19           THE VIDEOGRAPHER:  Can we switch tapes?

20           MR. WOLSON:  Do you?

21           MR. ARTHUR:  Yeah, go ahead.

22           THE VIDEOGRAPHER: - This marks the end of

23     tape number two in the deposition of Barrett Rochman.

24     We're going off the record.  The time on the monitor is

25     approximately 3:33 p.m.

```
 1              (Break was taken.)
 2          THE VIDEOGRAPHER:  We're back on the record.
 3   Here marks beginning of tape number three in the video
 4   deposition of Barrett Rochman.  The time on the monitor
 5   is approximately 3:35 p.m.  Please begin.
 6                  EXAMINATION
 7   QUESTIONS BY MR. ARTHUR:
 8          Q.   Good afternoon, Mr. Rochman.  My name is
 9   Steve Arthur.  I introduced myself to you at the
10   beginning.  I'm Mr. Gupta's attorney.
11          A.   Yes, sir.
12          Q.   I'm going to try to avoid -- I'm just going
13   to try to fill in some questions that this -- the
14   bank's counsel's questions prompted and -- and go from
15   there.  You -- when you were asked about the
16   conversations you were having with the Sandberg Phoenix
17   firm looking into the possibility of -- looking into
18   having them help you analyze your concerns about the
19   137(b) forms that were being filled out by Mr. Gupta in
20   Indiana, you said that -- you were asked about that,
21   and you said that Gupta does all of his own work.
22   How -- how did you know that?
23          A.   When you compete against someone for several
24   years, the only time he retains counsel is when he has
25   a litigious problem.  You have to make presentation to
```

1      the court on your tax proceedings.  Everybody who's

2      generally in the business uses counsel expect Bill

3      Groom and Mr. Gupta.  They represent themselves.

4           Q.   You talking about at the auctions

5      themselves?

6           A.   No, no, no, no.  In court.

7           Q.   In court.  But as far as the tax auctions

8      themselves go, did you believe that Mr. Gupta did his

9      own work as far as giving title and notification to

10     redeeming property owners, or did you know?

11          A.   I -- I'm not sure what your question means.

12          Q.   Well, you made the statement that one of the

13     reasons that you were looking into a potential lawsuit

14     with -- against Mr. Gupta was the fact that he did all

15     of his own work, and I'm trying to understand what you

16     meant by that statement.  And you've told me that --

17     that -- that that means that he -- when he was in

18     litigation against you he would --

19          A.   Not against me.

20          Q.   -- represent himself?

21          A.   Not against me.

22          Q.   Okay.

23          A.   Against the marketplace.

24          Q.   Explain that for me.

25          A.   Okay.  If there are -- it's a timeframe.

1    You cannot file your 137(b) for 30 days.  It gives
2    people the go ahead so that the individual can pay his
3    taxes plus his ten percent without having to incur any
4    additional costs.  At the time you file your 137(b),
5    you've signed an affidavit that you've said that you've
6    incurred a cost that is attached to that redemption.
7    Without ever making any notification whatsoever that
8    anybody, anyhow, any way about 60 percent, 70 percent
9    redeem before you even start making notifications.
10   Now, but you start your 137(b) process within 30 days.
11   The affidavit indicates you have incurred and paid.  I
12   read that affidavit to be you had to incur and you had
13   to pay.  I made sure that the attorney that would
14   represent us had his money.  He incurred -- he was
15   starting the case.  He was paid.  He incurred a bill.
16   He notified me about the bill.  He had a check in his
17   hands.  I called literally from the various courthouses
18   to make sure the check was in his hands, and he
19   confirmed that he was paid before I would sign an
20   affidavit.
21         Q.   Okay.  At the time you were having these
22   conversations with the Sandberg law firm, had you
23   talked to Mr. Gupta about whether he used an attorney?
24         A.   No.
25         Q.   Had you talked to him as to whether he had

1   used his son Vivek Gupta as an attorney --

2       A.   No.

3       Q.   -- to help him with this?

4       A.   No.

5       Q.   Had you seen any checks or any invoices

6   that -- that would've gone between him and any attorney

7   for the payment of title and notification work?

8       A.   No.

9       Q.   So at the time you were going to the

10  Sandberg Phoenix firm, did you have any factual basis

11  other than just reviewing the 137(b) forms to support

12  your belief that Mr. Gupta did this work himself

13  without the assistance of an attorney?

14      A.   **Just dealing historically with this**

15  **gentleman for seven to eight years, he did not use**

16  **counsel.**

17      Q.   How did you know that during this seven to

18  eight year period as far as the title and notification

19  work that he wasn't hiring an attorney to assist him?

20      A.   **Other --**

21      Q.   What's your basis for making that statement?

22      A.   **General historical background plus -- and I**

23  **can't remember which one or two other tax buyers**

24  **indicated that they -- that Bill Groom and Mr. Gupta**

25  **did everything pro se.**

1      Q.   Okay.  So -- so there were other competitors

2  who told you that they did -- they didn't use

3  attorneys?

4      A.   **They didn't believe he used an attorney.**

5      Q.   Okay.  Can you name them?

6      A.   **No.**

7      Q.   When did those conversations occur?

8      A.   **Right after I saw the 137(b) and tried to**

9  **get it analyzed, and I believe I sent the 137(b) I got**

10  **an indication what I thought it was and then trying to**

11  **get my arms around what that meant, what it really**

12  **meant, and then the next time I was in during research**

13  **and I would run into a tax buyer what did they know**

14  **about this, what did they do, how did they handle this**

15  **seemly discrepancy.  Either this is the biggest mother**

16  **load of payments of charging people for work not done,**

17  **or there's something I'm missing.  What was I missing?**

18      Q.   In your research in talking to these other

19  buyers, did you try to verify what basis they had for

20  saying that Mr. Gupta did his own work without the

21  assistance of an attorney?

22      A.   **Their attorneys would say when he showed up**

23  **in court he never had an attorney.**

24      Q.   Okay.

25      A.   **He represented himself.**

1      Q.    As far as -- I'm asking about the title and

2   notification costs that are -- that are certified in

3   the 137(b) document.  When you were looking at bringing

4   a class action suit against --

5          A.    Yeah.

6      Q.    -- Mr. Gupta --

7          A.    Yes.

8      Q.    -- you -- I'm trying to figure out if you

9   had -- what your basis was for believing that that work

10   was not being done by an attorney and -- and --

11          A.    My basis was historical -- I'm going to come

12   back to the same answer.

13      Q.    But what is the historical basis.  You say

14   you talked to a couple of buyers --

15          A.    Yes.

16      Q.    -- who said that they have that belief?

17          A.    Yes.

18      Q.    You didn't verify that?

19          A.    I knew from my own experience when we would

20   be in court and Mr. Gupta would be in court in

21   Illinois, which is not Indiana, he would be there on

22   his own, and they confirmed that he was the same

23   person.  My attorney in Indiana indicated that when

24   he'd show up in court Mr. Gupta was there on his own.

25      Q.    Okay.

1          **A.     So it was filling into place that the style**
2     **of operation had not changed.**
3          Q.    You don't have to go to court to conduct a
4     title search on a piece of property?
5          **A.     No.**
6          Q.    Do you?
7          **A.     No.**
8          Q.    And you don't have to go to court in order
9     to give notice to redeeming property owners that they
10    have a right to redeem?
11         **A.     Correct.**
12         Q.    At the time you were talking to the Sandberg
13    firm about pursuing a lawsuit against Mr. Gupta, did
14    you have any factual basis, any specific knowledge that
15    Mr. Gupta was not using an attorney to assist him in
16    doing those title searchs or giving the notices to
17    redeeming property owners?
18         **A.     No.**
19         Q.    Okay.  When -- you talked about your
20    conversation with Mr. Crissen, and you had two
21    conversations?
22         **A.     I believe so.**
23         Q.    In the first conversation, you said that you
24    started the conversation about asking him if he had any
25    concerns about the tax liens, and I don't think you

1   really -- you really finished that answer.  Did he --
2   did he tell you that he had concerns about the
3   redemption costs that he paid?
4        **A.   Absolutely.  That they were --**
5        Q.   Okay.  And what did he tell you in that
6   conversation about his concern?
7        **A.   He couldn't afford the continuous nature of**
8   **the payments he had made against the small tax bills.**
9   **He only owned a very small farm, and he was about -- he**
10  **came very close to losing it twice.**
11       Q.   Okay.  So Mr. Crissen told you that he had
12  concerns about the redemption costs?
13       **A.   Yes.**
14       Q.   And did he tell you how long he had had
15  those concerns before you called him?
16       **A.   This had happened to him two or three times.**
17       Q.   Did you talk about with Mr. Crissen as to
18  whether he complained to anyone at any county office
19  about his concerns on redemption costs?
20       **A.   No, sir.**
21       Q.   Did you ask him if he had contacted an
22  attorney to investigate whether these redemptions costs
23  were appropriate or not?
24       **A.   No.**
25       Q.   Did you ask him if he had talked to

1    Mr. Gupta?

2         **A.    I recall -- but this could be wrong.   I**

3    **recall him maybe indicating he had contacted Mr. Gupta,**

4    **but I'm not sure.**

5         Q.    You're not sure what he said, or you're not

6    sure that he brought that issue up?

7         **A.    Between Mr. Groom and Mr. Gupta someone**

8    **contacted somebody, but I'm not sure which one.**

9         Q.    Okay.  So you don't have a specific

10   recollection --

11        **A.    No, sir.**

12        Q.    -- of Mr. Crissen saying that he had

13   contacted Mr. Gupta?

14        **A.    Correct.**

15        Q.    So it was your understanding after your

16   conversation -- your first conversation with

17   Mr. Crissen that he had a concern about these issues

18   before you ever called him?

19        **A.    Oh, golly, yes.**

20        Q.    Okay.  You also said that you told him that

21   there were firms out there who handled these kind of

22   cases?

23        **A.    Yes.**

24        Q.    What -- what firms handle these kind of

25   class action cases other than the Sandberg Phoenix

1  firm?

2      A.    I probably misspoke when I said firms.   I

3  knew of -- in class action there are firms out there

4  looking for class action suits generalistically.

5      Q.    Okay.  You knew -- the -- the firm that was

6  in your mind when you were talking to Mr. Crissen was

7  the Sandberg Phoenix firm?

8      A.    Because they were reviewing my concerns over

9  me.  They were then reviewing Mr. Groom's.

10     Q.    So when you called Mr. Crissen, you had the

11  Sandberg Phoenix firm in mind as the firm you would

12  refer to him if he had an interest?

13     A.    I thought I could make that call, yes.

14     Q.    Now, you were handed invoices from the

15  2009/2010 period --

16     A.    Yes.

17     Q.    -- where your company paid the Sandberg law

18  firm for assisting you in investigating whether you

19  could bring a class action claim against Mr. Gupta?

20     A.    No.  Whether I could -- if I was an injured

21  party and I couldn't get it through my head I wasn't an

22  injured party.  Probably dogged in requesting more and

23  more because it just didn't make sense.

24     Q.    So during this time, you were contemplating

25  bringing a lawsuit on behalf of yourself?

1      A.    Yes.

2      Q.    And you were looking at bringing that

3   lawsuit against other buyers at tax property auctions?

4      A.    Yes.

5      Q.    And you've identified a couple of those

6   competitors.  I think you identified Gupta, Groom, and

7   one other company; is that correct?

8      A.    Oh, no.  I thought of the two immediately

9   because I knew in one case Mr. Groom had -- in court

10  had indicated that he did not do any of this work in an

11  appellate decision.  That was given to me by a

12  competitor.

13     Q.    Did you have a discussion with Mr. Gupta

14  where he said he did not do this work?

15     A.    I had no discussion with Mr. Gupta.

16     Q.    Did you have a discussion with anyone prior

17  to contacting Mr. Crissen where they told you that

18  Mr. Gupta did not do this work?

19     A.    Generalistically there was discussion that

20  way.

21     Q.    And who did you have a discussion with?

22     A.    With my local attorney, with other tax

23  buyers.

24     Q.    Who's your local attorney?

25     A.    Mr. Gleason -- Leason.

1    Q.    And who are --

2    A.    **Wayne Gleason.**

3    Q.    And who are the other tax buyers?

4    A.    **I remember Chris from Halifax, and I**

5    **remember some generalistic tax buyers.  We don't -- you**

6    **don't get on a real close nature with your competitors.**

7    **You try to avoid conversation with your competitors.**

8    Q.    Other than this gossip --

9    A.    **Yes.**

10   Q.    -- or opinions that people had --

11   A.    **Yes.**

12   Q.    -- were you given any specific evidence

13   prior to -- in 2009/2010 when you were talking to the

14   Sandberg Phoenix firm that would prove that Mr. Gupta

15   was not incurring title or notification costs?

16        MR. SANDBERG:  Objection; repetitious.

17   A.    **Exact -- am I allowed to answer?  Okay.  The**

18   **answer would be specifically no.**

19   Q.    (BY MR. ARTHUR)  Okay.  You've talked about

20   this lawsuit that you were thinking about bringing.

21   Did you -- you never brought a lawsuit; correct?

22   A.    **I was told that I was --**

23        MR. SANDBERG:  You shouldn't be talking

24   about --

25   A.    **No.  The answer is no.**

1          Q.    (BY MR. ARTHUR)  You made a statement during

2     your answers on direct that you could not -- and I

3     wrote it down -- quote, you could not get over the fact

4     that I was not an injured party.

5          A.    Yes.

6          Q.    Why do you believe you were not an injured

7     party?

8          A.    **I could not bid.  They had an artificial**

9     **wall they built up in a pricing situation that I would**

10    **have to pay and they would not have to pay if they**

11    **wanted to self-redeem.  If I self-redeemed, I would**

12    **only get my tax money back, or I would not get the**

13    **money I incurred and paid to my attorneys.  That wasn't**

14    **refundable.**

15         Q.    Okay.

16         A.    **They could go ahead and do this without**

17    **doing that.  It put them at an advantage anywhere from**

18    **500 to 1,200 dollar advantage on each bid.**

19         Q.    I'm trying to understand -- I want you to

20    tell me what your understanding is as to why you were

21    not an injured party, why you decided not to pursue a

22    lawsuit because you thought you were not an injured

23    party.

24                   MR. GREEN:  Well --

25                   MR. ARTHUR:  He can tell me his

1   understanding of that.

2          MR. GREEN:  You're not to say what your

3   attorney told you.  He's asking you what you believe is

4   the basis for you not being able to bring a lawsuit.

5      **A.    Am I allowed to answer that?  Is there an**

6   **objection then answer or just no answer?**

7          MR. GREEN:  No.  I'm just telling you not to

8   say what your attorney told you.  You can tell him what

9   your understanding is.

10     **A.    My understanding is what my attorney tells**

11  **me.**

12         MR. GREEN:  Then you're not going to say

13  that.

14     Q.    (BY MR. ARTHUR)  So you're not going to

15  answer what your understanding was?

16     **A.    I only understood what my attorney after a**

17  **great deal of research told me.**

18     Q.    So you're refusing to answer my question?

19     **A.    I guess I am.**

20     Q.    Okay.  We'll certify that.

21     **A.    Okay.**

22     Q.    Now, you were looking at bringing a class

23  action suit.  Were you looking at bringing a class

24  action suit in your position as a buyer against other

25  competitor buyers?

1       **A.**   **Yes.**

2       Q.   All right.  So a class action suit means

3  that there were other people like you who were injured

4  by the conduct of people like Mr. Gupta?

5       **A.**   **Yes.**

6       Q.   Is that your thought?

7       **A.**   **Yes.**

8       Q.   And were there any other buyers who you

9  talked to who were interested in joining a class action

10  lawsuit?

11      **A.**   **I did not talk to other -- other buyers**

12  **about a class action suit.**

13      Q.   What's your birthday?

14      **A.**   **March 1, 1943.**

15      Q.   And -- and what town do you live in?

16      **A.**   **Carbondale, Illinois.**

17      Q.   And would you tell me your educational

18  background?

19      **A.**   **High school, college, 72 hours in graduate**

20  **school.**

21      Q.   And where did you go to high school?

22      **A.**   **Formal high school Chicago.**

23      Q.   And what year did you graduate?

24      **A.**   **1960.**

25      Q.   And where did you go to college?

1        A.    Loyola, Augustana, Ray Junior, Southern

2    Illinois University.

3        Q.    What year did you graduate?

4        A.    I was on the seven-year plan, so I graduated

5    I think in '67.  The longer I stayed in school, the ban

6    was out there, I was in much better shape.  Then I went

7    on to graduate school.

8        Q.    What was your major in undergraduate school?

9        A.    Majored in sociology minor in

10   anthro-psychology.

11       Q.    And then after graduating from college, you

12   say you had some additional post-graduate work?

13       A.    Yes.

14       Q.    And what was the subject matter of the

15   post-graduate study?

16       A.    Sociology then transferred over to marketing

17   then transferred over to economics then transferred

18   over to management.  I'm not sure what order.  It

19   started with rehab soc.

20       Q.    Okay.  And -- and those different pursuits

21   did not result in a Master's or Doctorate degree?

22       A.    No.

23       Q.    You were asked some questions about your

24   guilty plea to -- which I think was Exhibit 88; is that

25   right?

```
1        A.    You asked quest -- not you, he asked
2   questions.
3        Q.    Yeah.
4        A.    Yeah.
5        Q.    In addition to -- in addition to the
6   government's criminal action against you, which is
7   reflected here in United States of America versus
8   Barrett Rochman, which is the caption on Exhibit 88,
9   you have also been sued in a civil action for your
10  conduct; is that correct?
11       A.    Yes.
12       Q.    And you have been sued in Illinois state
13  court?
14       A.    Yes.
15       Q.    And the --
16       A.    Wait, wait, wait.  I mean, no.  Federal
17  court.
18       Q.    What's the name of the plaintiff that sued
19  you in --
20       A.    You had it there before.  It was --
21       Q.    Is it Lindow?
22       A.    No, no, no, no, no, no.  It was Phoenix
23  versus John Bridge.
24       Q.    Okay.  In 2013 after all of this -- after
25  this criminal investigation was disclosed, you were
```

1    sued in March of 2013 in Illinois in a class action

2    case?

3        A.   Yes.

4        Q.   And the plaintiff in that case was Lindow?

5        A.   **There are several plaintiffs.  Me personally**

6    **Barrett Rochman, yes.**

7        Q.   Okay.  Lindow was one of the plaintiffs who

8    commenced an action against you?

9        A.   **Yes.  Well, without seeing a document in**

10   **front of me there are three suits.  Each one names two**

11   **companies, each one named individually.  One names**

12   **Barrett Rochman personally.**

13       Q.   All right.  And what law firm represents you

14   in that action?

15       A.   **Sandberg Phoenix.**

16       Q.   And what lawyer at Sandberg Phoenix

17   represents you?

18       A.   **Okay.  The coordinating attorney is Bhavik**

19   **Patel, but I've been turned over to Andrew.  And --**

20       Q.   Andrew who?

21       A.   **I guess I could -- can I ask you that?  I**

22   **don't --**

23            MR. SANDBERG:  Kasnetz.

24       A.   **Okay.  Andrew.  And there's -- there's three**

25   **attorneys in this team.  Bhavik is the person you call**

1     to decide who I call.  He just distillates my concerns

2     to the proper people I should talk to.  He doesn't

3     represent me in the class action personally.

4          Q.   And has SI Securities been sued in that

5     lawsuit?

6          A.   Yes.

7          Q.   And you understand that that lawsuit alleges

8     that you and others have conspired to violate Illinois

9     antitrust laws?

10          MR. GREEN:  Are you asking what the nature

11     of the suit is?

12          MR. ARTHUR:  I'm asking him if he

13     understands that that's the allegation that's been made

14     against him in the class action.

15          MR. GREEN:  Okay.  You can answer that

16     question.

17          A.   I believe so.

18          Q.   (BY MR. ARTHUR)  And who is John Vasson?

19          A.   An attorney tax buyer out of Belleville.

20          Q.   And Mr. Vasson has been sued in that class

21     action suit that was filed in 2013 along with you;

22     correct?

23          A.   Correct.

24          Q.   And Mr. Vasson was another targeted

25     defendant of the government for engaging in illegal

1   activity?

2       A.    Yes.

3       Q.    Do you know has Mr. Vasson pleaded guilty to

4   those activities?

5       A.    I believe he did.

6       Q.    Do you know if he's been sentenced?

7       A.    No, he has not been sentenced.

8       Q.    Who is his lawyer, if you know?

9       A.    I don't know.

10      Q.    Is it the Sandberg firm?

11      A.    No.

12      Q.    Who is Scott McLain?

13      A.    Another tax purchaser.

14      Q.    And he was another alleged coconspirator?

15      A.    Correct.

16      Q.    And the -- the civil class action alleges

17  that -- that Mr. Vasson and Mr. McLain and you and

18  others conspired to violate the Illinois antitrust

19  laws?

20      A.    Implicitly conspired we strongly suspected.

21      Q.    Okay.  Did Mr. McLain plead guilty to the

22  federal charges against him?

23      A.    Yes, he did.

24      Q.    And Mr. Bathon was the public official who I

25  believe you testified that you had made contributions

1   to and who was involved in this conspiracy; is that

2   right?

3        A.   Correct.

4        Q.   And Mr. Bathon has also pleaded guilty in

5   federal court?

6        A.   Yes.

7        Q.   And has he been sentenced?

8        A.   Yes.

9        Q.   And what was his sentence?

10       A.   30 months.

11       Q.   Do you have an agreement with the government

12   as to what your sentence or punishment will be as a

13   result of your guilty plea?

14       A.   I have an agreement with the caveat that the

15   judge can do whatever he wants.

16       Q.   And what is your agreement with the

17   government as to the sentence that will be imposed upon

18   you on December the 21st?

19       A.   On the low side five and five; five months

20   in camp five months at home.  On the high side 16

21   months to be decided on camp at home, however he

22   decides, but there are no guarantees.

23       Q.   Is there an agreement with respect to fines

24   or monitory penalties that you might face?

25       A.   There is a recommendation.

1      Q.    And what is the recommendation?

2      **A.    Between 10 and 30,000 dollars.**

3      Q.    Is the -- is there a guarantee on that?

4      **A.    No.**

5      Q.    What do you understand is the maximum

6   penalty --

7      **A.    Between one --**

8      Q.    Let me finish my question.

9      **A.    I'm sorry.**

10     Q.    I'm sorry.  What do you understand the

11  maximum fine that can be imposed against you?

12     **A.    Between one and five percent of the total**

13  **amount of purchases I made at those four years of**

14  **sales.**

15     Q.    And can you estimate what that amount would

16  be?

17     **A.    30 something thousand up to probably**

18  **180,000.**

19     Q.    Okay.  And this -- this conspiracy, which

20  you've pleaded guilty to, what period of time did it

21  cover?

22          MR. GREEN:  Well, he's stipulated to the

23  fact that the government entered into the record, and

24  that's what he pled to.  To the extent that you are

25  asking a question that I think could put him in

1  jeopardy in state court, he will raise his Fifth

2  Amendment to the question you've asked him.

3      Q.   (BY MR. ARTHUR)  Fair enough.  What period

4  of time did the government allege that this -- these

5  conspiratorial criminal activities were occurring?

6      **A.   It's in the plea.**

7      Q.   Do you know what the -- what the time period

8  was?  Well, let me shortcut it.  My -- my review of the

9  stipulation of facts and -- and the things that I've

10  read is that it was in the 2007 time period.  Does that

11  sound right?

12      **A.   I'm not sure.**

13      Q.   Okay.  And the 2013 class action cases that

14  have been brought against you are still pending?

15      **A.   Yes.**

16      Q.   Has -- in the government's investigation, do

17  you know were there any allegations or investigation of

18  Jessie Rochman?

19      **A.   I know of no investigation of Jessie**

20  **Rochman.**

21      Q.   And in the civil lawsuit that was filed in

22  2013, were there any allegations against Jessie

23  Rochman?

24      **A.   Not that I know of.**

25      Q.   Now, you mentioned the Phoenix Bond case.

1    That's another class action in which you were sued;

2    correct?

3         A.    Yes.

4         Q.    And the Phoenix Bond case involved Cook

5    County up by Chicago?

6         A.    Yes.

7         Q.    And just so that the record is clear, the

8    class action suits that were filed in 2013 involved

9    what county?

10        A.    Madison County.

11        Q.    And where is Madison County in the state of

12   Illinois?

13        A.    Deep southern Illinois over by East St.

14   Louis.

15        Q.    Okay.  Thank you.  And in the Phoenix Bond

16   case, this was a civil class action case in which you

17   were accused of mail fraud under the federal RICO laws?

18        A.    Yes.

19        Q.    And what did you understand the plaintiffs

20   were accusing you of doing?

21        A.    Violating RICO.

22        Q.    And how did -- how were they accusing you of

23   violating RICO in that case?

24        A.    There was a rule -- a treasurer's rule that

25   had the affidavit that we had honored the rule.  The

1   rule was specific, and they believed we had violated

2   the rule, not a law but a rule, a rule of conduct

3   within the sale.

4       Q.   And your son Jessie Rochman was a named

5   defendant in that lawsuit?

6       A.   Yes.

7       Q.   And the plaintiffs made the same allegations

8   against him that they made against you?

9       A.   Yes.

10      Q.   And they alleged that you and your son and

11  others conspired to violate the federal RICO laws?

12      A.   Yes.

13      Q.   At the time that this lawsuit was going on,

14  was Jessie Rochman an attorney?

15      A.   No.  He was in college at law school.

16      Q.   You testified that you settled that case.

17  Do you know what year you settled it?

18      A.   2010/2011.

19      Q.   Are you sure that Jessie Rochman wasn't

20  already an attorney in 2010?

21      A.   When we settled, he may have been an

22  attorney.  When it came out, he had to report it to the

23  law school that he was a member of a class action, and

24  he was already -- anyway, yes, he was a member of a

25  class action.

1     Q.   Okay.  So while this lawsuit was going on,

2  Jessie Rochman became an attorney?

3     **A.   Yes.**

4     Q.   And before it was settled, he became an

5  attorney?

6     **A.   I believe so.**

7     Q.   And before the case settled, he was an

8  attorney at the Sandberg Phoenix law firm?

9     **A.   I believe so.**

10     Q.   And -- and Jessie Rochman settled the case

11  at the same time you settled the case?

12     **A.   We settled for everybody in my family at the**

13  **same time.**

14     Q.   Did you make a monitory payment?

15     **A.   Yes.**

16     Q.   And what did you pay?

17          MR. GREEN:  Well, is there a confidential

18  provision within --

19     **A.   I think there's a confidential provision.**

20  **I'm sorry.**

21          MR. GREEN:  How does this relate -- you're

22  very far afield in terms of relevancy for your

23  proceedings, aren't you?

24          MR. ARTHUR:  I don't think so, but I'm not

25  going to discuss --

1             MR. GREEN:  I haven't raised it yet.

2             MR. ARTHUR:  If you want to object, object.

3             MR. GREEN:  Well, I haven't yet, but to the

4      extent that there's a confidential -- he said that.

5      He's not going to answer that question.  It violates

6      that unless you can show some relevancy for these

7      proceedings.

8          Q.   (BY MR. ARTHUR)  Is the -- did the

9      settlement contain a confidentiality provision?

10         **A.   I believe it did, but -- but if I'm wrong, I**

11     **could be wrong.**

12         Q.   Okay.

13         **A.   The attorneys they take it.  They handle it.**

14     **They just tell me what I'm to do.**

15         Q.   You have a copy of the settlement agreement

16     in your -- in your papers?

17         **A.   I'm sure it's somewhere.**

18         Q.   You were also asked about your relationship

19     to a whole bunch of business entities.

20         **A.   Yes.**

21         Q.   That had your -- some had your name; some

22     did not, and you -- you referred in answer to most of

23     those questions that there was a chart?

24         **A.   My son has kept a chart Kenny, and he works**

25     **very closely with the -- with the estate because of the**

1    estate planning.  That's how it all started.  All the

2    companies had to interrelate had to be charted who did

3    what, how, where, and when for estate planning, though.

4    This all started with this firm as estate work.

5         Q.   Okay.  And -- and you say your son did that

6    work.  Which son?

7         A.   Kenny.

8         Q.   Okay.  And tell me what sons and daughters

9    you have.

10        A.   Cory and Carrie.

11        Q.   And where do they reside?  What --

12        A.   Cory is in West Palm.

13        Q.   Okay.

14        A.   And Carrie --

15        Q.   How old is he [sic]?

16        A.   In her 40 --

17        Q.   She.

18        A.   You're asking me.  I have nine children.  I

19   do not remember one birth date except one, so.

20        Q.   Then I -- then I won't ask you ages.

21        A.   I can't --

22        Q.   I won't ask you their birthdays.  Just give

23   me their names, and tell me where they live.

24        A.   Okay.  Cory lives in West Palm.  Carrie --

25        Q.   Is -- is Cory involved in these businesses?

1        A.    No, no, no, no.

2        Q.    Okay.  The next one?

3        A.    **Timmy lives in O'Fallon.**

4        Q.    Is he involved in any of your businesses?

5        A.    **No.**

6        Q.    Okay.

7        A.    **Jessie lives in O'Fallon.  You already know**

8     **who he is.**

9        Q.    And -- and what -- what businesses do you

10    have that Jessie Rochman is currently involved in?

11       A.    **One, I think.**

12       Q.    What is the name of that company?

13       A.    **Roil.**

14       Q.    Pardon me?

15       A.    **Roil.**

16       Q.    Okay.  And what is the purpose of that

17    company?

18       A.    **We created a -- not a tax purchasing**

19    **company.  We created an oil buying company.  We**

20    **research oil estates.**

21       Q.    Do you have particular states that -- that

22    that company targets in its research?

23       A.    **Illinois.**

24       Q.    Any other companies that you know of that

25    Jessie Rochman has an interest in currently?

1          A.     It would have to be on an estate chart.

2          Q.     Okay.  Well, let's keep going with your

3    children.  Then we'll go back to the chart.

4          A.     Okay.  Let's see, we got Carrie, and she's

5    in Carbondale.

6          Q.     Is she involved in your businesses?

7          A.     She's bookkeeping.

8          Q.     Okay.

9          A.     Okay.  We have Kenny.  He's in management.

10         Q.     And where does he live?

11         A.     In Carbondale.

12         Q.     Okay.

13         A.     We have Tommy.  He lives in the basement.

14   He's still trying to find out who he is.  He's a good

15   kid.

16         Q.     Is he involved in your businesses?

17         A.     He is -- he takes care of my -- he is our

18   little errand person or message person.  He takes -- my

19   wife is almost blind, so he's filled in a role for the

20   family of doing, and he helps.  He works at the winery.

21   He helps out.  Wherever he's needed he's there.  Let's

22   go through the rest of the kids.  Bo died in a car

23   accident.  That was Jeremy.  Christopher moved to New

24   Hampshire, but he works does tax research.  Who am I

25   missing?  Have I covered -- have I covered eight living

1    **children and one dead one?**

2        Q.   So your testimony is the only way you could

3    really answer questions about your ownership interest

4    in the various Rochman business entities is to review

5    this chart?

6        **A.   Yes.  The only way you would get to the**

7    **answers you want would be to have a copy of the chart I**

8    **think.**

9        Q.   And you understand that that chart would --

10   would be able to tell us who the owners are and the

11   relationship of those companies with each other?

12       **A.   Yes.**

13       Q.   Why did you not produce that chart in

14   response to the bank's subpoena to you?

15           MR. GREEN:  It wasn't relevant to what was

16   requested.  He responded to -- I did the discovery for

17   the subpoena response.  It wasn't requested.

18           MR. ARTHUR:  What -- was it disclosed on a

19   privilege log?

20           MR. GREEN:  I didn't claim privilege.  It

21   wasn't requested.

22       Q.   (BY MR. ARTHUR)  Okay.  If -- if that

23   document was requested, would you have it available to

24   produce?

25       **A.   I believe --**

1           MR. GREEN:  Now, wait a minute.  We would

2     look at it.  If you guys subpoena it, we will determine

3     whether or not we would raise confidential relations

4     with respect to his estate planning.  I think that

5     there would be a protective order potentially that

6     everybody would agree to, so, yes, potentially.

7           Q.   (BY MR. ARTHUR)  Okay.  I think my question

8     was just could you produce it if we asked for it, not

9     -- not would you produce it but is available to be

10    produced?

11           **A.   Kenny could produce it.**

12           Q.   Okay.

13           **A.   Yes.**

14           Q.   You could obtain it from Kenny?

15           **A.   I believe I could.**

16           Q.   All right.  You were also asked on direct

17    about conversations that you had with Mr. Gupta, and

18    you -- you identified minor pleasantries at tax sales,

19    talking to him briefly during a courtroom proceeding,

20    and you said there was a telephone call.  Do you recall

21    the --

22           **A.   No.**

23           Q.   -- substance of the telephone call?

24           **A.   No, I don't, but I remember a telephone**

25    **call.**

1      Q.   Do you remember the reason that you talked

2   to him on the telephone?

3      A.   No.

4      Q.   Did you ever meet with Mr. Gupta in your

5   offices?

6      A.   Good question.  I don't recall that.  If he

7   says he's been there, then I'll have to believe he's

8   been there.

9      Q.   Well, you -- you've had a legal dispute with

10  Mr. Gupta about your -- your mall; is that correct?

11     A.   He's had legal dispute.

12     Q.   Well, you've been in a legal battle with him

13  about the mall; correct?

14     A.   Yes.

15     Q.   And what's the name of your mall?

16     A.   Illinois Star Center.

17     Q.   And you're an owner in that business?

18     A.   Sabre is an owner in that business.

19     Q.   Okay.

20     A.   Sabre Group, LLC.  Now, if I get this wrong

21  and the chart says something different, please don't

22  get too angry because my son keeps saying I mix and

23  match all these different organizations.

24     Q.   And Mr. Gupta bought rights to a parking lot

25  that was adjacent to this Illinois Star Mall?

1      **A.     Yes.**

2      Q.    Is -- did you bid on that piece of property,

3   the parking lot?

4      **A.    I think I may have, yes.**

5      Q.    Okay.  But Mr. Gupta out bid you?

6      **A.    Under bid me.   You bid down in Illinois.**

7      Q.    He under bid you, and he was successful in

8   getting the property and you were not?

9      **A.    Yes.**

10     Q.    And then Mr. Gupta asked you to -- your

11  company to pay him rent for the mall owner -- for the

12  mall users to be able to park in his lot?

13     **A.    Yes.**

14     Q.    And what was your response to that?

15     **A.    In reviewing his rights to it, we realized**

16  **it was an easement.  We fortunately didn't win that**

17  **bid, and so he, according to the appellate court and**

18  **the -- and the local courts, he has no right to keep**

19  **people from parking on that parking lot so they can go**

20  **back and forth to the mall.**

21     Q.    So as the property stands now today, the

22  Sabre company owns the mall?

23     **A.    It owns part of the mall.**

24     Q.    Owns part of the mall, and Mr. Gupta still

25  owns the parking lot?

1    A.    Yes.

2    Q.    Who's Jerome Brosky?

3    A.    **One of Mr. Gupta's agents, buying agents.**

4    Q.    Does that name refresh your memory as to

5    whether Mr. Gupta and Mr. Brosky met with you in your

6    offices to discuss this mall dispute?

7    A.    **I don't have that recollection.  If they do,**

8    **I don't.**

9    Q.    Okay.  What factual basis did you have

10   before contacting Mr. Bowen about suing Mr. Groom to

11   believe that Mr. Groom was not paying title and

12   notification costs --

13   A.    **Because --**

14   Q.    -- in the state of Indiana?

15   A.    **-- had just got through an appellate**

16   **decision where he testified that he did not hire an**

17   **attorney and he did not hire an abstractor to do that**

18   **work.**

19   Q.    And that was information you had before you

20   contacted Mr. Bowen?

21   A.    **Yes.**

22   Q.    Okay.  Did you ever threaten Mr. Groom with

23   litigation?

24   A.    **No, I didn't threaten.**

25   Q.    Did you ever tell Mr. Groom not to bid on

1   properties?

2        A.    Not that I recall.

3        Q.    Did your agents ever demand that Mr. Groom

4   not bid on properties?

5              MR. GREEN:  To the extent that you know.

6        A.    Not that I know of, no.

7        Q.    (BY MR. ARTHUR)  Well, let me ask it a

8   different way.  Did you ever direct your agents to

9   demand that Mr. Groom not bid on properties either in

10  Illinois or Indiana?

11       A.    No.

12       Q.    In -- in Indiana is it your understanding

13  that each county sets the amount that can be paid for

14  title and notification work?

15       A.    That's my belief.

16       Q.    And is there a procedure in Indiana if you

17  believe that your -- you've incurred greater than the

18  amount set by the county for title and notification

19  costs that you can go to the court and ask that the

20  court approve a higher amount?

21       A.    That's my understanding.

22       Q.    Have you ever used that procedure to be paid

23  a higher amount per title and notification work?

24       A.    Yes.

25             MR. ARTHUR:  Okay.  Can we take a break,

1    short break?

2              THE VIDEOGRAPHER:  The time is approximately

3    4:19 p.m.  We're off the record.

4                   (Break was taken.)

5              THE VIDEOGRAPHER:  We're going back on the

6    record.  The time on the monitor is approximately 4:23

7    p.m.  We're back -- please continue.

8         Q.   (BY MR. ARTHUR)  Thank you, Mr. Rochman.  I

9    have no further questions at this time.

10             MR. FRIEDRICH:  No questions.

11                        EXAMINATION

12   QUESTIONS BY MR. SANDBERG:

13        Q.   Mr. Rochman, I just have a few questions.

14             MR. WOLSON:  You need a mic, John.

15        Q.   (BY MR. SANDBERG)  In the questioning this

16   afternoon, we've talked a lot about the Illinois tax

17   auctions, and we've talked about Indiana tax auctions.

18   Are their systems the same or very different?

19        **A.   They're very different.**

20        Q.   So let's just briefly talk about the Indiana

21   tax auctions.  In each county, the -- all the property

22   the tax certificates are put up for sale in a public

23   auction?

24        **A.   Yes.**

25        Q.   Anyone can attend the auction as long as

1    they just register and write down their name as to who

2    they are?

3         A.    Yes.

4         Q.    And then they're put up for auction, and

5    whoever bids the most gets the tax certificate?

6         A.    Yes.

7         Q.    And you have been a bidder in Indiana tax

8    sales for a number of years?

9         **A.    Several years.**

10        Q.    Okay.  And from your experience, you

11   referenced this, you said you thought you were at a

12   competitive disadvantage in Indiana tax sales?

13        A.    Yes.

14        Q.    Why -- can you explain why you thought you

15   were at a competitive disadvantage?

16        **A.    Okay.  Hundred dollars -- I dealt in**

17   **farmland and oil.**

18        Q.    And when you say you dealt in oil, what do

19   you mean?

20        **A.    Oil -- they -- they sell oil rights, royalty**

21   **working and overrides.  The tax bills are a hundred**

22   **dollars, 106, 112, 118.  We do extensive research to**

23   **know the amount and quantity of oil that these**

24   **particular leases produce.  In fact, the county gives**

25   **you almost no information.  You have to do it all**

```
 1    yourself.  They don't -- it's like if it was a house
 2    they would say 312 -- 312 Elm Street.  Here they won't
 3    even tell you the -- they give the name, the lease, but
 4    they won't tell you whether it's a royalty.  They won't
 5    tell you whether it's working.  They won't tell you
 6    production numbers.  They say it's private, and just
 7    until recently the law got changed because we were at
 8    -- so we had to do so much in depth research.  So
 9    you're dealing with $112 bill.  Now, you can make a
10    mistake of $112, and you can buy a piece of oil that --
11    because you have to do all your own work and they give
12    you none of the information, you can easily make a
13    mistake as we did in one case where we didn't -- we got
14    -- we went forward on a tax deed, and we've got $3 a
15    month coming in.  We had to pay for an attorney, and we
16    had to add abstracted.  We paid the 100 and some
17    dollars, and that came out to a thousand dollars and
18    change.  We also had to bid to get it.  We bid around
19    6, 700 dollars, so that was another 6, 700 dollars
20    added to it.  So it's $1,600 tied up in a $3 return
21    because we -- instead of if we could've done our own
22    work we wouldn't have incurred that cost, but we
23    couldn't have charged it either.  Now, if you got a $3
24    tax bill or a $3 return, you can come in and redeem
25    yourself out, but you don't get compensated back for
```

1   the fees you've incurred.  You just get compensated

2   back for the overbid.  See, so my $700 bid on a hundred

3   dollar tax I get 600 back, but I would not get the

4   thousand I paid in attorney abstract fees.  If -- if I

5   wanted to game Indiana, I would go ahead and I would

6   buy so many -- I would bid that darn thing up in such a

7   way to win as many bids as you could because you could

8   go ahead and redeem -- and not pay a legal fee, not pay

9   an abstract fee until the very end.  Sign your 137(b)

10  about two months before expiration because 60, 70, 80

11  percent redeem.  So if you get your 137(b) in and you

12  haven't incurred these costs, you're getting an extra

13  500 to 1,200 dollars a unit free without having to

14  spend a time.

15      Q.   And that's what you referred to as

16  competitive disadvantage?

17      A.   Oh, of course.  Because now I've got so much

18  money in I can't redeem myself out, so I took the $3

19  coming to me monthly, so then we have what we call

20  shadow bidders, and they wait to see what you're going

21  to do.  And they bid on your research, and certain

22  people shadow you out.  You'll know who the guys who do

23  the work.  Halifax does their work.  They're

24  phenomenal, but I'll see Chris at the courthouse.  I'll

25  see him at grantor/grantee books.  I'll see employee

1      all sorts of records to make sure he knows what he's
2      bidding on.  When he bids, he bids.  When he bids, he
3      wants it.  Some people bid just to game you, run you
4      up.  Some people bid because they can go ahead and get
5      their money back, and -- and if they're smart enough,
6      they can bid on some quality items.  Go to Indiana and
7      bid on so many items and bid on hundreds, thousands of
8      items, and for 70 percent of those items you won't have
9      to spend a dime but you'll get an extra 500 to 1,200
10     dollars a unit beyond the normal interest rate that
11     you'd get, which is not bad, but it's not a great
12     interest rate.  The money's in this.
13         Q.   What is the interest rate that the Indiana
14     statute --
15         A.   Ten percent annual.
16         Q.   And so that is what the statute says is the
17     return you're entitled to is the interest?
18         A.   On your -- on the tax and your overbid but
19     you are not entitled to any interest on your expenses.
20         Q.   So if you -- as your example, if you bid
21     $700 for a piece of property, you're entitled to
22     interest on the $700?
23         A.   Yes, sir.
24         Q.   Thank you.  That's all I have.
25              MR. WOLSON:  Nothing further.

```
1              MR. ARTHUR:  Nothing.

2              THE VIDEOGRAPHER:  Read and sign.

3              MR. GREEN:  We will not waive.

4              THE VIDEOGRAPHER:  This concludes the

5    videotaped deposition of Barrett Rochman.  The number

6    of tapes used was three.  The master videotapes were

7    retained by CaseWorks, Inc. in Greensboro, North

8    Carolina.  We're going off the record.  The time is

9    approximately 4:30 p.m.

10                  (WHEREIN, the deposition was concluded

11                   at 4:30 p.m. and signature was not

12                   waived.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2

3          I, JOANNA CHARLTON, RPR, CCR(MO), CSR(IL),

4    the officer before whom the foregoing deposition was

5    taken, do hereby certify that the witness whose

6    testimony appears in the foregoing deposition was duly

7    sworn by me; that the testimony of said witness was

8    taken by me to the best of my ability and thereafter

9    reduced to typewriting under my direction; that I am

10   neither counsel for, related to, nor employed by any of

11   the parties to the action in which this deposition was

12   taken, and further that I am not a relative or employee

13   of any attorney or counsel employed by the parties

14   thereto, nor financially or otherwise interested in the

15   outcome of the action.

16

17                       _____

18                       JOANNA CHARLTON,
                         RPR, CCR(MO), CSR(IL)
19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, JOANNA CHARLTON, Certified Court

 4   Reporter, the officer before whom the foregoing

 5   deposition was taken, do hereby certify that the

 6   witness whose testimony appears in the foregoing

 7   deposition was duly sworn by me; that the testimony

 8   of said witness was taken by me to the best of my

 9   ability and thereafter reduced to typewriting under

10   my direction; that I am neither counsel for, related

11   to, nor employed by any of the parties to the action

12   in which this deposition was taken, and further that

13   I am not a relative or employee of any attorney or

14   counsel employed by the parties thereto, nor

15   financially or otherwise interested in the outcome of

16   the action.

17

18                         _____

19                         JOANNA CHARLTON, CCR

20

21

22

23

24

25
```

1/10/2014  BARRETT ROCHMAN

1        WITNESS'S CERTIFICATE

2

3        I, BARRETT ROCHMAN, do hereby certify

4    that I have read and understand the foregoing

5    transcript and believe it to be a true, accurate, and

6    complete transcript of my testimony, subject to

7    the attached list of changes, if any.

8

9                    _____
                     BARRETT ROCHMAN

10

11       This deposition was signed in my presence by

12   _____, on the _____ day of

13   _____, 2014.

14

15

16                    _____
                     Notary Public

17

18   My commission expires:

19

20

21

22

23

24

25

```
 1    CaseWorks, Inc.
      7622 Bentley Rd                        (Page 1 of 2)
 2    Greensboro, North Carolina 27409

 3                 E R R A T A   S H E E T

 4    Re: Joshua Crissen v. Vinod Gupta, et al.

 5    Deposition of: BARRETT ROCHMAN

 6              Please read this transcript with care, and if
      you find any corrections or changes you wish made, list
 7    them by page and line number below.   DO NOT WRITE IN
      THE TRANSCRIPT ITSELF.  Return the
 8    Certificate and Errata Sheet to this office after
      it is signed.  We would appreciate your prompt
 9    attention to this matter.
              To assist you in making any such corrections,
10    please use the form below.  If supplemental or
      additional pages are necessary, please furnish same and
11    attach them to the errata sheet.

12    Page _____ Line _____ should

13    read:_____

14    Page _____ Line _____ should

15    read:_____

16    Page _____ Line _____ should

17    read:_____

18    Page _____ Line _____ should

19    read:_____

20    Page _____ Line _____ should

21    read:_____

22    Page _____ Line _____ should

23    read:_____

24    Page _____ Line _____ should

25    read:_____
```